**CHEM–HAULERS, INC., Petitioner,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Respondents.**

**No. 75–2021.**

United States Court of Appeals, Fifth Circuit.

Aug. 4, 1976.

Walter Harwood, Nashville, Tenn., Maxwell A. Howell, Washington, D. C., for petitioner.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Peter M. Shannon, Jr., Attys., Dept. of Justice, Washington, D. C., for the U. S.

Fritz R. Kahn, Kenneth G. Caplan, Hugh W. Cuthbertson, I. C. C., Washington, D. C., for I. C. C.

E. Stephen Heisley, Karl W. Sonneman, Washington, D. C., David A. Lang, New Orleans, La., for intervenor Colonial Freight Lines.

Phineas Stevens, Rhesa H. Barksdale, Jackson, Miss., Kim D. Mann, Washington, D. C., for intervenor Deaton, Inc.

Before GOLDBERG, DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Petitioner Chem-Haulers, Inc. brings this action to review, enjoin, annul, and suspend an order of the Interstate Commerce Commission (the Commission, I.C.C.) granting Colonial Fast Freight Lines, Inc. (Colonial) a certificate of public convenience and necessity to act as a common carrier of nonferrous scrap metal and certain other nonferrous items between Attalla, Alabama and Steele, Alabama, to and from other points within the eastern half of the United States. The I.C.C. order collaterally interpreted the operating certificate of Chem-Haulers as not extending to carriage of the commodities in question. In addition to the questions raised on the merits of the case, an intervenor (Deaton, Inc.) has challenged our jurisdiction to entertain this petition, alleging that it was filed out of time. We conclude that we have jurisdiction of the appeal, consider it on the merits, and affirm.

In August, 1973 Colonial filed an application with the I.C.C. seeking authorization to operate as a common carrier over irregular

routes transporting (1) aluminum and zinc articles and non-ferrous scrap between Attalla, Alabama and Steele, Alabama, on the one hand, and points throughout the eastern half of the United States on the other, and (2) non-ferrous scrap throughout the eastern half of the United States. The Commission assigned Colonial's application to its "modified procedure" docket, a method of handling cases upon written affidavits without oral hearing unless required for cross-examination.[1]

Verified written statements were submitted by Colonial and the supporting shippers (Culp Iron and Metal, Inc., of Attalla, Alabama, and its affiliate, Culp Smelting and Refining Company, Inc., of Steele, Alabama) to the Commission. Twelve protestants, including Chem-Haulers, submitted verified statements in opposition to the application. Colonial submitted a written rebuttal. The I.C.C.'s Review Board Number One granted Colonial's application in part, finding by order served September 4, 1974, that Colonial had proved its case as to portions of part 1 of its application for the transportation of aluminum and zinc *ingots, bars,* and *sows* and nonferrous scrap metal, but not for aluminum and zinc *articles.* Review Board Number One found Colonial had not submitted adequate proof to support part 2 of the application, and denied that portion. Colonial and Chem-Haulers each filed a petition for reconsideration of the Review Board's order. In due course, by order served February 18, 1975, the Commission, Division One, acting as an ap-

pellate division, denied all petitions and affirmed the Review Board's order. The Commission proceedings are administratively final. Our jurisdiction is invoked by Chem-Haulers pursuant to provisions of the Administrative Order Review Act, Title 28, U.S.C., Sections 2341–2351.[2]

## I. JURISDICTION

The initial problem we must consider is one of jurisdiction, raised by an intervenor, Deaton, Inc. Pursuant to Public Law No. 93–584, enacted January 2, 1975, 88 Stat. 1917, certain orders of the Commission were made reviewable under the Administrative Orders Review Act, Title 28, U.S.C., Section 2341 et seq. (the Hobbs Act). The Hobbs Act requires that, for jurisdiction to vest within a competent court, the petition seeking review must be filed with the court "within 60 days after its [the final order's] entry . . ."[3]

In this case, Appellate Division One met in regular session February 6, 1975, and decided to affirm the order of the Review Board. This determination is recorded within the official minutes of the Commission. The Commission's decision was not served upon Chem-Haulers, nor the public generally, until February 18, 1975, at which time a formal final order was released.[4] Chem-Haulers filed notice of appeal April 18, 1975—59 days after service of the order, but 71 days after the actual Commission decision date. The time provisions of the Hobbs Act are jurisdictional,[5] and may not

---

1. 49 C.F.R. Section 1100.5(j) provides:

    "The term 'modified procedure' means the procedure specified in Rules 45 to 54, inclusive, [49 C.F.R. Sections 1100.45 to 1100.54] which rules provide for the filing and serving of pleadings in proceedings with a view to limiting the matters upon which subsequent oral evidence, if any, will be introduced."

2. Prior to the enactment on January 2, 1975 of Public Law 93–584, which by its terms applies to all judicial proceedings to review commenced on and after March 1, 1975, Commission orders were judicially reviewable by district courts of three judges under the authority of Title 28, U.S.C., Sections 1336, 1398, 2284, and 2321–2325.

3. Title 28, U.S.C., Section 2344 reads in pertinent part:

    "On the entry of a final order reviewable under this chapter the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies . . ."

4. The decision and service dates are reflected on the face of the appealed order.

5. *Microwave Communications, Inc. v. F.C.C.,* 1974, 169 U.S.App.D.C. 154, 515 F.2d 385.

be altered or enlarged by this court.[6] We must determine therefore whether the date of "entry" as specified by the Hobbs Act is the date of decision, in which case we are without jurisdiction to consider the merits of the petition, or the date of service, in which case our jurisdiction is properly invoked. The legislative history of Pub.L. No. 93–584 is ambiguous. Although passages within Senate and House reports stated that a petition for review must be filed within 60 days of the date of *service* of the order, S.Rep. No. 93–500, 93d Cong. 1st Sess. 4, (1973); H.R.Rep. No. 93–1569, 93d Cong. 1st Sess. 9, (1974), U.S.Code Cong. & Admin.News, 1974, p. 7025, certain departmental communications attached to the House Report, and incorporated therein, arguably contradict the prior assertion. *See* Letter of W. Vincent Rakestraw, Assistant Attorney General, to Chairman of the House Committee on the Judiciary, H.R. Rep. No. 93–1569, supra, at 12; Statement of George M. Stafford, Chairman of the I.C.C., December 10, 1974, H.R.Rep. No. 93–1569, supra, at 15. Both the letter and the statement speak of review within 60 days of the *entry* of an appealable order, which leads back directly and without light to our problems: What does *entry* mean? Since we find no help in this morass, we reach our decision by examining the I.C.C.'s interpretation of the Hobbs Act, and by drawing imperfect analogies from judicial decisions in roughly parallel areas.

In I.C.C. practice an official minute record is kept by the Commission in compliance with the statutory mandate that "[e]very vote and official act of the Commission, or any division, individual Commissioner, or board shall be entered of record, and such record shall be made public upon the request of any party interested". Title 49, U.S.C., § 17(3). Deaton contends that

this minute record is made contemporaneously with the session at which a decision is reached, and is the "entry of a final order" contemplated by Title 28, U.S.C., § 2344.

The I.C.C. as well as Deaton, Inc., and Chem-Haulers have submitted to us memoranda on the issue of jurisdiction. The Commission supports the petitioner on this point, taking the position that jurisdiction is present. The I.C.C. explanation of its procedure is that the minute record of the Commission's actions is not the "date of entry", but rather simply describes or tallies the particular action taken by the Commission setting forth the names and votes of the individual commissioners. The order is not made a part of the minute record, nor recorded at the session itself. The Minute Clerk seldom makes a "minute entry" on the day he notes the occurrences of a Commission session, but prepares the minutes days, often weeks, after the session. Until such time as the official minutes are prepared, the only record of the Commission's actions in any particular case is within the work notes of the Minute Clerk. The date on the minute entry, reflected on the face of the order, represents the date of the Commission's action, not the date the minutes were recorded or prepared by the Minute Clerk. At the close of the calendar year the minutes of the various Commission sessions are collected and bound within a record book; prior to this the minutes are not systematically bound in any manner.

■ At a time later than the Commission session in which a decision is reached an order is prepared for that action. The Commission's seal[7] and the Secretary's signature are affixed immediately prior to the service of the order. The I.C.C. position is that this signature and seal constitute the "entry" of the order, corresponding to the date of service of the order,[8] and fixes the

---

**6.** Fed.R.App.P. 26(b), provides in part that:
"[The Court of Appeals may not] enlarge the time prescribed by law for filing a petition to enjoin, set aside, suspend, modify, enforce or otherwise review, or a notice of appeal from, an order of an administrative agency, board, commission or officer of the United States, except as specifically authorized by law."

**7.** See Section 17(3) of the Interstate Commerce Act, 49 U.S.C. § 17(3), which provides in part that "[t]he Commission shall have an official seal, which shall be judicially noticed."

**8.** At least one decided case appears to distinguish between the date of entry and the date of service. Jurisdiction was not at issue in that

date when the 60 day limitation period commences. We conclude that the I.C.C. correctly appraises the effect of its procedure.

■ It is established that interpretations of a statute by the agency charged with its administration should weigh heavily absent a compelling reason to the contrary. See, e. g., *Red Lion Broadcasting Co. v. F.C.C.*, 1969, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 383; *Ute Indian Tribe of Uintah & Ouray v. Probst*, 10 Cir. 1970, 428 F.2d 491, cert. denied 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186. This is not the precise situation before us, but we are persuaded that I.C.C.'s interpretation of terms relating to its own procedures are similarly entitled to some deference, especially where there is no compelling precedent or reason tending to support an opposite view.

■ Under judicial, as opposed to administrative, rules, notably Rule 4(a) of the Federal Rules of Appellate Procedure and Rule 79(a) of the Federal Rules of Civil Procedure, the date of entry of a judicial order must be recorded in the official court docket; the order is final and appealable only when it is so entered. See, e. g., *Erstling v. Southern Bell Telephone and Telegraph Co.*, 5 Cir. 1958, 255 F.2d 93. The I.C.C. has no rule requiring the entry of orders in an official docket,[9] and hence we cannot analogize the act determining the appealability of a judicial order to that determining the entry of an I.C.C. order.

*Statler Distributors v. Alexander*, 1 Cir. 1945, 148 F.2d 74, involved the review of an administrative order in which the agency involved moved to dismiss the petition. The Court of Appeals observed:

"The pending petition was filed pursuant to § 4(h) of the Federal Alcohol Administration Act, 49 Stat. 977, 27 U.S.C.A. § 204(h), to review and set aside an order of the District Supervisor, First District, of the Alcohol Tax Unit, Bureau of Internal Revenue, Treasury Department, dated December 29, 1943, denying petitioner's application for a basic permit.

\* \* \* \* \* \*

"Under § 4(f) of the Act, orders denying such applications shall be served (1) in person by a designated officer or employee, or "(2) by mailing the order by registered mail, addressed to the applicant \* \* \* at his last known address in the records of the Administrator." Section 4(h) provides that a petition for review of such order may be filed in the appropriate Circuit Court of appeals "within sixty days after the entry of such order."

The crucial phrase "entry of such order" is not defined in the Act. It has reference to official action of an administrative officer, who is not required either by the Act or by applicable regulations to keep a docket book or other comparable record. Therefore, little help is afforded by decisions defining what constitutes the "entry" of a judgment under statutes regulating appeals from judgments of a court."

*Statler*, supra, 148 F.2d at 74–75.

In this situation the court relied upon an affidavit of the respondent agency to determine office procedure for the handling of the pertinent applications. According to the affidavit that procedure consisted of an orderly system including: the maintenance of a docket file, carried under the number and name of the applicant, and indexed on an administratively maintained card listing each docket file entry. The agency considered the card as an index, for agency convenience and not as a docket book or record such as that maintained by the

case. See *W. T. Mayfield and Sons Trucking Co. v. United States*, N.D.Ga.1964, 234 F.Supp. 655, 656: "This is an action brought . . . to enjoin, annul and set aside an order of the Interstate Commerce Commission . . . *entered* June 12, 1963, and served on June 21, 1963 . . . ." (Emphasis ours). *Mayfield* was brought under the prior jurisdictional statute, see note 2, supra, which provided in part that "[a]ny action brought under subsection (b) of this section shall be filed within 90 days from the date that the order of the Interstate Commerce Commission becomes final". Title 28, U.S.C., § 1336(c).

9. 49 C.F.R. 1001.1(d) provides however that "all docket files" [of the I.C.C.] may be examined by the public.

courts. The court, in light of the agency's practices and other considerations, concluded that:

"Without undertaking to give a comprehensive interpretation of the statutory phrase "entry of such order", it suffices for this case to hold that the order of denial has at least been entered, within the meaning of § 4(h), when it has been signed and placed in respondent's files as a completed act, and the copy of the order, forwarded to the applicant by registered mail pursuant to § 4(f), has actually been received by the applicant. Whether anything less would amount to an entry of the order it is not necessary now to decide."

*Statler,* supra, 148 F.2d at 75.

The situation in *Statler* and that here are not parallel. Different statutes are involved, but we note and approve the approach to the problem taken by the First Circuit in analyzing the agency's office procedure for the basis of agency concepts of when an order is "entered". Because of the different statutory schemes involved, two of the three factors of entry listed by the court, the mailing and the receipt provisions, are not apposite here. But the initial factor listed—that the order be signed and placed within the agency files as a completed act—we view as similar to the signature and seal procedure the I.C.C. advises us is its touchstone in determining entry. Both procedures, that of the Alcohol Tax Unit in *Statler* and that of the Commission, indicate the finality of an official action, rather than an intermediate or tentative procedure.

Certain Federal Communications Commission orders, also subject to review under Title 28, U.S.C., § 2344 within "60 days after its [the order's] entry", are further statutorily defined as final and are "computed from the date upon which public notice is given of the orders disposing of all petitions for rehearing filed with the Commission in such proceeding or case . ." 47 U.S.C., Section 405. See, *American Civil Liberties Union v. F.C.C.,* 1973, 158 U.S. App.D.C. 344, 486 F.2d 411.

While neither judicial procedure nor statutes dealing solely with agencies other than the I.C.C. are dispositive of the issue before us, the rules, statutes, and cases we have considered are illustrative of, and consistent with, the contentions expressed by petitioner and the I.C.C. in the instant case: that the period should run from the time when the order appealed is final, complete, and a matter of public record. The decision date, reflected on the face of the order, is not the time these three events coincide. The date the order is signed, the Commission seal is affixed, and the order is served, is such a date.

Practical considerations, as well as concededly imperfect analogy to the meager case law available, support our conclusion that the Commission's construction of the date of "entry" is the correct one. Before the appealing party has access to the Commission's order (assuming it has learned of the contents of the minute record reflecting the bare Commission decision) it has not the means to assess the legal basis for appeal. Title 28, U.S.C., Section 2344, requires the party petitioning for review to state the "grounds on which relief is sought" as well as to attach a copy of the "order, report, or decision" of the agency to the petition for review. These requirements are not possible of accomplishment prior to the release of the order by the I.C.C. As noted at oral argument, if Deaton's analysis of the issue is correct, the Commission has the power to insulate its orders from judicial scrutiny by delaying service of the order until sixty days after its decision date. In our view it would be incongruous to rule that the speed with which the Commission issues an order following the session date at which it decides a matter is determinative of the variable length of time in which aggrieved parties may seek judicial review. We hold that the petition for review was timely filed and proceed to consider it on its merits.

## II. THE STANDARDS OF JUDICIAL REVIEW

■ The scope of judicial review of Commission action is narrow; the courts

must give proper deference to the Commission's expertise in reviewing its decisions. "The Court is not empowered to substitute its judgment for that of the agency". *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 1974, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456, quoting *Citizens to Preserve Overton Park v. Volpe,* 1971, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136, 153. See also, *Illinois C.R. Co. v. Norfolk & W.R. Co.,* 1966, 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162; *Consolo v. Federal Maritime Commission,* 1966, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131; *Universal Camera Corp. v. NLRB,* 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; *U. S. v. Pierce Auto Freight Lines,* 1946, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821. Chem-Haulers contends that the Commission grant of operating rights to Colonial is not predicated on substantial evidence, is not rationally based, and is not in accord with the law.[10] Substantial evidence within the context of court review of administrative agency action has been defined by the Supreme Court:

"We have defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. of New York v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. '[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' *National Labor Relations Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *National Labor Relations Board v. Nevada Consolidated Copper Corp.,* 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305; *Keele Hair & Scalp Specialists, Inc. v. FTC,* 5 Cir., 275 F.2d 18, 21." [Footnote omitted]

*Consolo v. Federal Maritime Commission,* 1966, 383 U.S. 607, 620–621, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140–141. The *Consolo* standards apply to the review of I.C.C. orders granting operating authority to a carrier. *Florida Terminals & Trucking Co. v. United States,* M.D.Fla.1973, 363 F.Supp. 1355, 1360.

The Motor Carrier Act, incorporated as Part II of the Interstate Commerce Act defines the authority and duty of the I.C.C. in the grant of operating rights. Section 206(a)(1) of the Motor Carrier Act, Title 49, U.S.C., Section 306(a)(1) states in part:

**10.** The criteria for court review of agency action are carefully spelled out by the Administrative Procedure Act (APA). Section 10(e) of the APA, Title 5, U.S.C., § 706, provides:

**"§ 706. Scope of review**
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."
These six provisions, § 706(2) (A through F) provide separate standards against which courts must measure action by the Commission. *Bowman Transport, Inc. v. Arkansas-Best Freight System, Inc.,* 1974, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447, 455.

"Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: . . ."

Section 207(a) of the Motor Carrier Act, Title 49, U.S.C., Section 307(a) provides that:

"Subject to section 310 of this title, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise, such application shall be denied . ."

That Commission interpretation of what best serves the "public convenience and necessity" controls for review here is manifest from Supreme Court decisions.

"Public convenience and necessity is not defined by the statute. The nouns in the phrase possess connotations which have evolved from the half-century experience of government in the regulation of transportation. When Congress in 1935 amended the Interstate Commerce Act by adding the Motor Carrier Act, it chose the same words to state the condition for new motor lines which had been employed for similar purposes for railroads in the same act since the Transportation Act of 1920, § 402(18) and (20), 41 Stat. 477, 49 U.S.C.A. § 1(18, 20). Such use

indicated a continuation of the administrative and judicial interpretation of the language. Cf. *Case v. Los Angeles Lumber Co.,* 308 U.S. 106, 115, 60 S.Ct. 1, 7, 84 L.Ed. 110. The Commission has assumed, as its duty under these earlier subsections, the finding of facts and the exercise of its judgment to determine public convenience and necessity. This Court approved this construction. *Chesapeake & Ohio Ry. v. United States,* 283 U.S. 35, 42, 51 S.Ct. 337, 339, 75 L.Ed. 824. Cf. *Gray v. Powell,* 314 U.S. 402, 411, 412, 62 S.Ct. 326, 332, 86 L.Ed. 301. The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity. Cf. *Powell v. United States,* 300 U.S. 276, 287, 57 S.Ct. 470, 476, 81 L.Ed. 643. This, of course, gives administrative discretion to the Commission, cf. *McLean Trucking Co. v. United States,* 321 U.S. 67, 87, 88, 64 S.Ct. 370, 380, 381, 88 L.Ed. 544, to draw its conclusion from the infinite variety of circumstances which may occur in specific instances."

*Interstate Commerce Commission v. Parker,* 1945, 326 U.S. 60, 65, 65 S.Ct. 1490, 1492–1493, 89 L.Ed. 2051, 2058–2059. The Commission has established standards necessary to be met to qualify for an operating certificate of public convenience and necessity, going back to Pan American Bus Lines Operation, 1936, 1 M.C.C. 190, 204, where the Commission first stated:

"The question, in substance, is whether the new operation or service will serve a useful purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest."

Our examination of the issues raised in this appeal will be in conformance with the foregoing principles.

### III. THE EVIDENCE

The expanding needs of the supporting shipper and the capabilities of the applicant and the protestants were considered by the Commission. The following facts are elicited from the verified statements submitted by the parties:

The supporting shipper, Culp, has been in the scrap metal processing business at Attalla, Alabama, for forty years. It has established a subsidiary plant at Steele, Alabama, ten miles distant from Attalla. At Attalla, Culp buys and receives non-ferrous scrap metals from a variety of widely scattered sources. These are processed, purified, and shipped interstate. About eight million pounds of this metal is received and ultimately shipped outbound each year. At its Steele plant Culp melts aluminum and zinc scrap into "ingots", "deoxidizer notch bars", and "sows". The Steele plant receives about two million pounds of aluminum and zinc scrap each month, and ships out a processed metal weighing half that much. The incoming scrap moves from various points over the eastern half of the United States to each of Culp's facilities. The outbound tonnage distribution is equally widespread in the same territory. Culp listed cities in thirty-seven states and the District of Columbia as containing actual and potential suppliers and customers for its business. Until recently, forty percent of Culp's inbound scrap material moved by rail, and thirty-five percent of Culp's out-

bound tonnage moved in that manner. The balance of Culp's transport needs were hauled in its own (eight) vehicles, by customer supplied trucks, and by motor common carriers.

The railroad service has been or is being closed down, and Culp believes that the rail tonnage must now be hauled by motor common carriers. Culp has therefore supported Colonial's, as well as two other carriers', applications before the I.C.C.

Chem-Haulers possesses a certificate of public convenience and necessity denominated "sub 108" which licenses it to transport "[g]ravel, sand, clay, ore, slag, and products composed of or produced from such commodities except in bulk, in tank vehicles" between points in Minnesota, Iowa, Missouri, Arkansas, and Louisiana and all states east thereof (a total of 33 states) subject to minor restrictions not here pertinent. Chem-Haulers contends that this certificate authorizes transport by it of products and non-ferrous scrap used and produced by Culp. Chem-Haulers has in the past hauled similar commodities without incident. In 1972 Chem-Haulers sought and received an informal opinion letter [11] from the Commission stating the probable extent of the Sub 108 certificate. The letter stated the Sub 108 certificate to include "aluminum in its raw basic forms of sheets, wire, tubing, rods and the like made directly from molten aluminum". Although the letter was "informal only and not binding

---

[11]. Interstate Commerce Commission
BUREAU OF OPERATIONS

Washington, D.C.  20423

Janaury 6, 1972

IN REPLY REFER TO:
MC–116254 Sub 108

Mr. Walter Harwood, Attorney
for Chem-Haulers, Inc.
Suite 1822, Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee  37219

Dear Mr. Harwood:

This responds to your letter of November 9, 1971, concerning the meaning of the description in the certificate of Chem-Haulers, Inc., MC–116254 Sub 108, reading:

Gravel, sand, clay, ore, slag, and products composed of or produced from such commodities.

In my informal opinion this includes aluminum in its raw basic forms of sheets, wire, tubing, rods and the like, made directly from molten aluminum. The latter is a product produced from bauxite ore, the process involving reducing the ore to alumina and then into aluminum., This interpretation is in line with Commission decisions interpreting the term "petroleum products." However, it is informal only and not binding upon the Commission should the question arise in a formal proceeding.

Very truly yours,

(s) T. J. Delaney
T. J. Delaney, Chief of
Interpretations

on the Commission", Chem-Haulers argues that it strongly indicates the reasonableness of its position with regard to the supporting shipper's commodities. Chem-Haulers has hauled two loads of scrap for Culp. At the time the evidence was submitted, Chem-Haulers operated 20 flatbed trailers, and 23 iron or steel trailers suitable for hauling scrap. Chem-Haulers maintains terminals in Sheffield, Tuscaloosa, Birmingham, Decatur, and Guntersville, Alabama, as well as two Tennessee terminals and a Kentucky terminal.

Colonial's home office and main terminal is located at Birmingham, Alabama. It also maintains terminals at Annistom, Attalla, and Decatur, Alabama, from which it could serve the supporting shipper's plants, as well as other, more remote, terminals. Included within Colonial's truck fleet are 145 flatbed trailers suited to the supporting shippers' hauling needs.

The decision by Review Board Number One recited much of this evidence and included a recapitulation of each protestant's equipment, facilities, and authority, and the shipper's needs.

The Board, in summation, found:

> "*It further appearing,* That as regards part (1) of the application, applicant has proven a need for the inbound and outbound transportation of non-ferrous scrap metal and aluminum and zinc ingots, bars, and sows, which cannot be accommodated by existing services; that, although a shipper has a duty to inform itself of the availability of existing service and although the 'complete service' theory must not become a 'gimmick' to justify a grant of authority, the fact still remains that shipper genuinely requires the services of a carrier capable of transporting all of these involved commodities between the origin and destination points for its scrap supply and outbound brickettes, ingots, bars, and sows business; that protestants hold spotty and fragmented commodity and territorial authority insufficient to meet shipper's reasonable transportation needs; that none of these carriers, save Chem-Haulers, and

then only to a very limited extent, has participated in this traffic; and that a grant, to the extent indicated below, would not cause any protestant's traffic to be diverted or cause any protestant to lose a critical proportion of its revenue;

> \*   \*   \*   \*   \*   \*

> "*And it further appearing,* That otherwise the evidence of record establishes that applicant has suitable and available motor vehicle equipment, and is financially and otherwise fit, willing, and able properly to conduct the operation authorized; and that the evidence amply is phrased to conform to the evidence and current Commission practice; "

and concluded, based upon all the evidence, that:

> "*We find,* That the present and future public convenience and necessity require operation by applicant, in interstate or foreign commerce, as a common carrier by motor vehicle over irregular routes, of (1) aluminum and zinc ingots, bars, and sows, and non-ferrous scrap metal (except in dump vehicles), between Steele, Ala., on the one hand, and, on the other, points in and east of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and Texas (except Scottsboro, Ala.); and (2) non-ferrous scrap metal (except in dump vehicles), between Attalla, Ala., on the one hand, and, on the other, points in and east of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and Texas (except Scottsboro, Ala.); that applicant is fit, willing, and able properly to perform such service and to conform to the requirements of the Interstate Commerce Act and the Commission's rules and regulations thereunder; . . . "

The Board expressed no view as to whether Chem-Haulers Sub 108 certificate extended to the hauling of the commodities in question, although it recognized that Chem-Haulers had asserted such authority.

On administrative appeal, Division 1, acting as an appellate division, stated:

> "[P]rotestant Chem-Haulers asserts that the application should be denied on the basis of its pertinent authority to trans-

port 'products composed of or produced from ore'; that the commodities involved here are composed of or produced from scrap metals, rather than ore; that these commodities are therefore secondary products falling beyond the confines of protestant Chem-Haulers' rather limited operating rights, see *Ace Doran Hauling & Rigging, Ext.—Multiple States,* 119 M.C.C. 40, 48–49 (1973); that, moreover, assuming *arguendo* that Chem-Haulers held the requisite authority, the evidence of record would still warrant a grant of authority because of Chem-Haulers' minimal participation in shipper's traffic; . . . ."

The appellate division implicitly adopted the findings of the Review Board in the following conclusory paragraph.

"*It is ordered,* That the petitions and motion be, and they are hereby, denied and overruled respectively, for the reasons that the findings of Review Board Number 1 are in accordance with the evidence and applicable law, and that no sufficient or proper cause appears for consolidation or reconsideration."

The Commission's findings, as expressed and illustrated within the previously quoted portions of both Review Board Number One's order and that of Division One, are supported by substantial evidence in the form of the verified statements submitted by the parties. We think the Commission's findings adequately support the grant of a certificate of public convenience and necessity. It is conceded by Chem-Haulers that the new operation will be responsive to a public demand or need and will serve a public purpose, and no question is raised as to the applicant's fitness or willingness to perform the service. The sole point for disposition is Chem-Hauler's assertion that the Commission did not properly address itself to the determination of "whether this purpose [the public need upon which the authority is to be predicated] can and will be served as well by existing lines of carriers", *Pan American Bus Lines,* supra.

The Commission's order made alternative findings with regard to the service capaci-

ties of the protestant. It found first that Chem-Haulers did not possess the commodity authority to serve the shipper's needs, citing *Ace Doran Hauling & Rigging Extension-Multiple States,* 119 M.C.C. 40, 48–49 (1973), and secondly that "assuming arguendo that Chem-Haulers held the requisite authority, the evidence of record would still warrant a grant of authority because of Chem-Hauler's minimal participation in shipper's traffic".

A Western District of Pennsylvania three-judge district court has considered the propriety of the Commission determinating in an application proceeding the extent of a protestant's existing authority. The court held:

"It is believed that necessarily the scope of a protestant's authority is subject to interpretation when it protests an application which is pending before the Commission. The Commission must find that the public convenience and necessity require the requested operating rights. An important factor for the Commission to consider is whether the operating rights which are applied for are already covered by the certificates of the protestant. As it says in its report of January, 1962, 'We have consistently held that existing motor carriers should be afforded an opportunity to serve a shipper before a new carrier is authorized to enter a territory.' In the opinion of the Court this, of necessity, requires the Commission to review the scope of the authority of each competing carrier who protests an application."

*Worster Motor Lines, Inc. v. United States,* W.D.Pa.1963, 226 F.Supp. 603, 607. It is manifestly necessary for the Commission to appraise the commodity certificates of the protestant. Without such an appraisal the Commission could not assess the impact of the grant of the application on Chem-Hauler's business and services, nor could it decide whether the services sought are adequately handled by existing carriers.

While acknowledging this necessity, Chem-Haulers urges that we follow the route taken by a three-judge district court

in *Parkhill Truck Co. v. United States,* N.D. Okl.1961, 198 F.Supp. 362. In *Parkhill,* the applicant was granted operating authority despite a protestant's assertion that it was authorized to provide such a service, and was fully capable of doing so. The Commission determined that the protestant, Parkhill Truck Co., did not hold the authority it asserted, despite its past provision of such services. The district court reversed the Commission's order, stating:

"The situation here is that the objecting carrier has, under claim of right, performed the services sought to be covered by the application. Notwithstanding that such claim and performance were known to the supervising bureau of the Commission, no corrective action has been taken against the objector. The scope of the Parkhill authority can be determined effectively only in plenary proceedings which result in an appealable order. These may take the form of a cease and desist action brought by the Commission or an appropriate application by Parkhill for an interpretation of the scope of the commodity description in its certificate. When, as here, services have been performed by a carrier under claim of right, with knowledge of the Commission, and without adverse action by the Commission, an objection by that carrier to the issuance of a certificate of public convenience and necessity to another carrier should be considered on the basis that the objector was authorized to perform the services and any doubt as to that authority should be determined in plenary proceedings." (Footnote omitted)

*Parkhill,* supra, 198 F.Supp. at 365.

*Parkhill* appears to us to be in irreconcilable conflict with *Worster,* supra. To the extent that such a conflict exists, we are more impressed with the reasoning of *Worster* and decline to follow *Parkhill.* We note also the presence of significant factual distinctions between the situation before us here and the situation confronting the *Parkhill* court. For example, in *Parkhill* the Commission avoided consideration of the possible prejudice to existing carriers or the adequacy of existing service by short circuiting the process with what it called an "advisory determination" on the extent of Parkhill's services. In this case the I.C.C. has considered the damage to existing carriers, if any, and concluded that, assuming *arguendo* that Chem-Haulers possessed the asserted authority, the fact that it had hauled only two loads for the supporting shipper in the past was evidence that the issuance of the authority would not infringe significantly upon the protestant's operations.

■ Chem-Haulers urges various Due Process grounds in opposing the Commission's interpretation of its Sub 108 certificate in a manner inconsistent with the informal interpretation letter it had requested and received from the Commission, note 11, supra. A primary basis for petitioner's arguments are its fears the Commission's determinations within the instant proceedings may preclude on *res judicata* grounds the myriad challenges which Chem-Haulers would otherwise assert in a plenary proceeding. We were informed at oral argument of this case that such a plenary proceeding, for the purpose of determining the extent of Chem-Haulers' operating rights under its Sub 108 certificate, is in fact scheduled before the Commission. The Commission has assured us in brief and in oral argument that no *res judicata* connotation attaches to the determination of the extent of a protestant's commodity authority in an application proceeding, and that as such a protestant, Chem-Haulers will receive a full and fair opportunity in the plenary proceeding to present its case. The court in *Worster Motor Lines, Inc. v. United States, supra,* faced an identical situation. The *Worster* court accepted the Commission's assurances that no *res judicata* effect from the application proceeding's interpretation of the protestant's certificate would extend to a subsequent plenary proceeding for interpretation of that certificate. We do likewise and accept the assurances of the Commission and its counsel in this respect, bearing in mind that any order entered in such a plenary proceeding will be subject to judicial review.

The commodity authority of the Chem-Haulers' certificate is but a single facet of the larger I.C.C. determination of public convenience and necessity. While it is possible to envisage situations in which this determination might be crucial to judicial scrutiny of agency action, this is not such a case. The Commission's order contains slight if any stated basis for its interpretation of the extent of Chem-Haulers' Sub 108 certificate, other than reliance upon Ace Doran Hauling and Rigging, *supra*, a case we are informed is not yet final and reviewable. We recognize that "[t]he law is settled that interpretation of a certificate of public convenience and necessity is a matter for the Commission in the first instance, and the Commission's determination will not be set aside unless that determination is capricious, or arbitrary, or constitutes an abuse of discretion or contravenes an established principal of law". *George Transfer and Rigging Co. v. United States,* Md.1974, 380 F.Supp. 179, 185, aff'd mem. 419 U.S. 1042, 95 S.Ct. 613, 42 L.Ed.2d 636. If this were a petition from a Commission order interpreting a carrier certificate however, we would review much more carefully the basis of the Commission's interpretation, and presumably require more articulated support for that interpretation. Such is not the case before us at this time.

On this reasoning we conclude that while this record provides no basis for evaluation of the I.C.C.'s interpretation of Chem-Haulers' commodity certificate, such an inquiry by us is not the purpose of this proceeding, but merely an evidentiary facet thereof. Therefore, having determined the right, indeed the necessity, for the Commission to evaluate in this application proceeding the scope of a protestant's authority, we decline in this case to indulge in further elaboration as to the correctness vel non of the Commission's evaluation. We return to discussion of the primary question presented by the petition before us.

The Commission concluded that conceding without deciding that Chem-Haulers possessed the requisite commodity authority to transport the products in question "the evidence would still warrant a grant of authority because of Chem-Haulers' minimal participation in the traffic". Chem-Haulers urges that there was error in this finding, contending that it was necessary for the Commission to find "whether that purpose [the new service allegedly required] can and will be served as well by existing carriers" before granting the operating certificate sought. Petitioner argues that the Commission failed to make such a finding independent of its restrictive interpretation of the Sub 108 certificate.

We think this contention is not well taken. The rather short order of Division 1 is conclusive, not informative, as to the evidence considered. But the paragraph of the order disposing of the petitions "for the reasons that the findings of Review Board Number 1 are in accordance with the evidence and applicable laws" directs us to the Review Board's order. We find that the Board meticulously considered, step by step, the needs of the shipper, the capabilities of Colonial, and the commodity authority, facilities, and equipment of each of the protestants. The expanding needs of the shipper, due to the cessation of rail service, the comparatively small number of suitable trailers available to Chem-Haulers for supplying the shipper's increased needs, the fact that, in any event, Chem-Haulers did not have authority in six of the states which the shipper lists as "representative actual and potential origin and destination points" all lead inescapably to our firm view that there was ample evidence for the Commission to conclude that there was a need to grant Colonial's application because the shipper's traffic could not be served as well by existing certificated carriers. These are not "magic words". An operating certificate may properly issue from the Commission, and legal standards of public convenience and necessity be met, upon a showing of the need for an additional carrier even though no specific findings of inadequacy in existing service are made. *United States v. Dixie Highway Express, Inc.,* 1967, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639; *Florida*

*Terminals & Trucking Co. v. United States, supra,* 363 F.Supp. at 1359; *Petroleum Carrier Corp. v. United States,* M.D.Fla.1966, 258 F.Supp. 611. The factors of shipper's need, applicant's ability, and the capacity of existing carriers necessarily are interdependent. These considerations coalesce within the concept of public convenience and necessity. That the existing carriers, notably Chem-Haulers, have heretofore engaged only minimally in the shipper's traffic, and hence will not be crippled economically by the grant of authority, was relevant to this determination. See *United States v. Drum,* 1962, 368 U.S. 370, 374, 82 S.Ct. 408, 410, 7 L.Ed.2d 360, 364.

### IV.  CONCLUSION

In our view there was substantial evidence before the I.C.C. supporting its finding of public convenience and necessity requiring the grant of the operating rights in question to Colonial.

The Commission order attacked is AFFIRMED and the Petition to Set Aside and Enjoin is in all respects DENIED.

PETITION DENIED.