**NATURAL RESOURCES DEFENSE COUNCIL, Petitioner,**

v.

**NUCLEAR REGULATORY COMMISSION and United States of America, Respondents.**

No. 80–1328.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1981.

Decided Oct. 1, 1981.

As Amended Oct. 28 and Nov. 6, 1981.

Heidi Noun with whom Richard A. Lowe, Washington, D. C., was on the brief for petitioner.

Irwin B. Rothschild, III, Atty., Nuclear Regulatory Commission, Washington, D. C., with whom Sanford Sagalkin, Acting Atty. Gen., Anne S. Almy and James C. Kilbourne, Attys., Dept. of Justice, and Stephen F. Eilperin, Sol. Nuclear Regulatory Commission, and Richard A. Parrish, Atty., Nuclear Regulatory Commission, Washington, D. C. were on the brief for respondents.

Before BAZELON, Senior Circuit Judge, and MACKINNON and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MACKINNON.

Opinion concurring in the result filed by Circuit Judge EDWARDS.

Senior Circuit Judge BAZELON concurs in the majority opinion written by Judge MACKINNON and joins in Judge EDWARDS concurring opinion.

MACKINNON, Circuit Judge:

Section 206(a)(2) of the Energy Reorganization Act of 1974[1] requires directors and responsible officers of firms manufacturing or supplying the components of nuclear power plants to report to the Nuclear Regulatory Commission ("Commission") the discovery of "defects" in "basic components" which could create a "substantial safety hazard," unless the official has actual knowledge that the Commission has already been informed thereof.[2] Section 206(b) subjects any person who knowingly and consciously fails to comply with this reporting

---

1. Pub.L.No.93–438, Title II, § 206(a)(2), 88 Stat. 1246 (1974), *codified at* 42 U.S.C. § 5846(a)(2) (1976), ("Reorganization Act"), (hereinafter cited only to U.S.C.).

2. Section 206(a)(2) provides:

Any individual director, or responsible officer of a firm constructing, owning, operating, or supplying the components of any facility or activity which is licensed or otherwise regulated pursuant to the Atomic Energy Act of 1954 as amended, or pursuant to this chapter, who obtains information reasonably indicating that such facility or activity or basic components supplied to such facility or activity ... contains a defect which could create a substantial safety hazard, as defined by regulations which the Commission shall promulgate, shall immediately notify the Commission of such failure to comply, or of such defect, unless such person has actual knowledge that the Commission has been adequately informed of such defect or failure to comply.

42 U.S.C. § 5846(a)(2) (1976).

requirement to stringent civil penalties.[3] The Reorganization Act, however, does not define section 206's crucial terms: "defect," "basic component," and "substantial safety hazard." Rather, Congress left this task to the Commission to perform through rulemaking proceedings, specifically instructing that "[t]he Commission is required to adopt regulations promptly, with a view to defining the types of defect required to be reported relating to manufacture, assembly, installation, and operation."[4] It is the Commission's current definition of the term "basic component" with which we are primarily concerned in this case.

### I.

On March 3, 1975, the Commission published for comment a proposed rule designed to implement section 206.[5] Following extensive rulemaking proceedings, the Commission issued the final rule on June 6, 1977,[6] adding a new Part 21 to the Commission's regulations. The rule defined a "basic component" for a nuclear power plant as

a plant structure, system, component or part thereof necessary to assure (1) the integrity of the reactor coolant pressure boundary, (2) the capability to shut down the reactor and maintain it in a safe shut down condition, or (3) the capability to prevent or mitigate the consequences of accidents which could result in potential offsite exposures comparable to those referred to in [10 CFR § 100.11].[7]

The rule required, among other things, that each contract entered into for the purchase of a "basic component" after January 6, 1978 contain a clause subjecting the order to the reporting requirements of Part 21.[8] It also provided that the supplier/manufacturer of a basic component who discovers a defect in such a component after it is delivered to its purchaser must attempt to determine whether the defect could create a substantial safety hazard. Any manufacturer/supplier who cannot make this safety determination must so inform the purchaser, who must then evaluate the safety significance of the defect. The nuclear power plant licensee must make the ultimate safety determination if its lower-tier suppliers are unable to do so.[9] Finally, the rule provided the Commission with the authority to grant exemptions from its requirements under certain circumstances.[10]

Recognizing that it lacked experience in implementing a reporting program of this scope, which regulated the activities of many non-licensees, the Commission explained in the Statement of Consideration accompanying the final rule:

The Commission intends to examine closely the implementation of new Part 21 with a view to making any clarifying or other changes that may be warranted in light of experience. In particular, insufficient experience has been accumulated to permit the writing of a detailed regulation at this time that would pro-

---

**3.** Section 206(b) provides:
Any person who knowingly and consciously fails to provide the notice required by subsection (a) of this section shall be subject to a civil penalty in an amount equal to the amount provided by section 2282 of this title. 42 U.S.C. § 5846(b) (1976). At the time the Reorganization Act was passed, section 2282 of Title 42 provided for civil penalties of up to $5,000 per day, with a maximum fine of $25,000 in a thirty day period. *See* 42 U.S.C. § 2282(a) (1976). In 1980, Congress amended section 2282 to provide for a civil penalty not to exceed $100,000 per violation. Pub.L.No. 96–295, § 206, 94 Stat. 787 (1980).

**4.** H.R.Rep.No.1445, 93d Cong., 2d Sess. 37 (1974), U.S. Code Cong. & Admin. News 1974, pp. 5470, 5550.

**5.** *See* 40 Fed.Reg. 8,832 (1975).

**6.** *See* 42 Fed.Reg. 28,893 (1977).

**7.** 42 Fed.Reg. 28,894 (1977); 10 C.F.R. § 21.-3(a) (1980).

**8.** 42 Fed.Reg. 28,895 (1977); 10 C.F.R. § 21.-31(1980).

**9.** *See* 42 Fed.Reg. 28,895 (1977); 10 C.F.R. §§ 21.21, 21.51 (1980).

**10.** *See* 42 Fed.Reg. 28,895 (1977); 10 C.F.R. § 21.7 (1980) ("The Commission may . . . grant such exemptions from the requirements of the regulations in this part as it determines are authorized by law and will not endanger life or property or the common defense and security and are otherwise in the public interest.").

vide a precise correlation of all factors pertinent to the question of what is a significant safety hazard. Part 21 is intended in this regard as an initial effort to identify a number of the factors involved with the question of significant safety hazard. Further, additional guidance in the form of regulatory guides may be developed should experience with the application of Part 21 indicate the need for such guidance. In this regard, we expect that the implementation efforts of the staff and those subject to the rule, and the views of interested members of the public, should provide the necessary data base for such further guidance.[11]

Following promulgation of Part 21, the NRC received many requests for clarification of the rule. In response, the NRC staff held five public regional meetings during July 1977 to discuss and answer questions about the rule.[12] One recurring ques-

tion concerned how far down the tiers of suppliers Part 21 was to be applied.[13] The NRC staff indicated that "the entire supply chain involved in the production of a basic component for a power reactor that could create a substantial safety hazard, because of a defect in the component is within the scope of Part 21."[14] In other words, the staff maintained that the suppliers of all parts making up a basic component were subject to Part 21's reporting requirements.[15]

The staff's interpretation soon began to cause problems for the nuclear industry. Some suppliers of "commercial grade items"—off-the-shelf items not specifically designed for use in nuclear power plants—made such a relatively insignificant percentage of their total sales to the industry that they deemed it in their best business interests to simply stop dealing with the industry rather than expose themselves to the civil penalties which would follow any

11. 42 Fed.Reg. 28,892 (1977).

12. See "Remarks Presented (Questions/Answers Discussed) at Public Regional Meetings to Discuss Regulations (10 CFR Part 21) for Reporting of Defects and Noncompliance, July 12–26, 1977," NUREG-0302, Rev. 1, (hereinafter "Questions/Answers").

13. The Statement of Consideration accompanying the final rule stated only that "[t]he organizations subject to the regulations in Part 21 may be many procurement tiers away from the holder of a license to construct or operate a nuclear power reactor." 42 Fed.Reg. 28,892 (1977).

The Commission describes the procurement chain in its brief as follows:

[T]he procurement of parts, equipment and supplies needed to construct and maintain nuclear power plants involves a multitier procurement chain. At the top of the chain is the electrical utility and the utility's major contractors such as the nuclear steam system supplier. The next level includes manufacturers who produce components specifically designed for nuclear power plants such as reactor pressure vessels, nuclear instrumentation and controls, and major piping, pumps, and valves. These manufacturers in turn procure necessary parts such as resistors, wiring, solid state devices; and hardware—parts used throughout industry and not specifically designed for use in a nuclear power plant—from a multitude of sources. Ultimately, the procurement chain for such

items goes back to the supplier of the materials, such as manufacturers of steel and copper, and eventually ends at the mines where the necessary ores are procured.

Brief for Respondents at 7–8.

14. Questions/Answers, supra note 12, Part I "Remarks By the Office of Standards Development to Public Regional Meetings on 10 CFR Part 21 by W. E. Campbell, Jr., July 12–26, 1977," at 7; see also id., Part III, "Consolidation of Questions/Answers from Public Regional Meetings," at 21.3(a)-2.

15. The Commission describes the scope of this interpretation as follows:

The expansive reach of this approach is illustrated by considering the parts of a valve used in a safety related system in a nuclear power plant. Valves frequently are made of a multitude of parts including: a valve body, a bonnet and associated bolting, a gate, disc or plug, a stem, seats, packing, a packing gland, follower and related bolting, seal rings, valve yoke for mounting of accuator and/or hand wheel, and an assortment of small parts related to accessories such as nuts and bolts. Many of these parts such as the valve stem, the packing, and the nuts and bolts are not specifically designed for use in nuclear power plants, have numerous other common uses, and may be purchased from a catalog or "off the shelf."

Brief for Respondents at 8–9.

failure to comply with Part 21.[16] Others were unwilling to subject themselves to Part 21 because they were unable to identify which of their commercial grade items might have nuclear end uses.[17] As a result of Part 21's application all the way down the supply chain, some firms had great difficulty obtaining necessary components [18] and others were forced to acquire them from suppliers whom they considered less reliable.[19]

The Commission also began to receive many requests from suppliers of commercial grade items for exemptions from Part 21. Between January 5, 1978 and July 31, 1978, the Commission received 13 such requests.[20] The Commission staff estimated that each request required six man-weeks to process,[21] and predicted that a reprogramming of staff resources would be necessary if another thirteen were received.[22] The staff accordingly recommended to the Commission that Part 21 be amended.[23]

On October 19, 1978, the Commission issued an immediately effective rule exempting commercial grade items from the reporting requirements of Part 21 until the items were "dedicated" for use as a basic component for a nuclear power plant.[24] The Commission explained: [25]

Part 21 defines a "basic component" subject to the reporting and other requirements of the rule. In response to inquiries during and subsequent to the public regional meetings relating to "off-the-shelf" or "catalog" items, the staff provided guidance that such items may be within the scope of 10 CFR Part 21 depending on the circumstances at the time of procurement. This guidance has been construed by numerous organizations to mean that the requirements of 10 CFR Part 21 apply to manufacturers and distributors who are involved to any extent in supplying basic components, or parts of basic components, of a facility or activity including supplying base material or functional assemblies to the manufacturer of the "basic component." This meaning has led to the imposition of 10 CFR Part 21 at a procurement stage where there are no design or specification requirements that are unique to application of the item at a nuclear facility or activity, e.g., relays.

The use of this meaning of basic components has not improved the quality of such items, and therefore, has not enhanced safety. Instead it is causing most increases and inability to obtain needed supplies. To the extent that the purchaser is unable to obtain a needed item from the most qualified supplier and must turn to other less qualified suppliers, defining basic component to include such an item may to some extent detract from safety. To relieve the conditions that are resulting from the above interpretation and to mitigate this potential reduction of safety part 21 is being amended to remove from the scope of 10 CFR Part 21, during specific stages of procurement, those

---

16. *See, e.g.*, Joint Appendix ("App.") at 80, Letter from James F. Young, Vice President of General Electric, to Guy A. Arlotto, Director, Division of Engineering Standards, NRC, May 31, 1978, Attachment 1 at 3; Supplemental Appendix ("Supp.App.") at 9, Letter from L. M. Mills, Manager Nuclear Regulation and Safety, Tennessee Valley Authority, to the Secretary of the Commission, NRC, Aug. 6, 1979.

17. Brief for Respondents at 9.

18. *See, e.g.*, App. at 62, Letter from E. W. Rhoads Gould Inc., to E. Volgenau, Director, Office of Inspection & Enforcement, NRC, May 1, 1978; Supp.App. at 9, Letter from L. M. Mills, Manager, Nuclear Regulation and Safety, Tennessee Valley Authority, to the Secretary of the Commission, NRC, Aug. 6, 1979.

19. *See, e.g.*, Supp.App. at 4, Letter from A. E. Scherer, Licensing Manager, Combustion Engineering, to James B. Kelley, Acting General Counsel, NRC, July 7, 1978.

20. *See* SECY-78–496, Enclosure 4 (Sept. 8, 1978).

21. SECY-78–496 at 7 (Sept. 8, 1978).

22. *Id.*

23. *Id.*

24. 43 Fed.Reg. 48,621 (1978), amending 10 C.F.R. Part 21.

25. 43 Fed.Reg. 48,621 (1978).

items of a commercial grade, e.g., bearings, relays, a bar stock that are (1) not subject to design or specification requirements unique to facilities or activities licensed by the Commission, (2) used in applications other than facilities or activities licensed by the Commission, and (3) able to be ordered from the manufacturer/distributor on the basis of the manufacturer's published specifications. At a defined stage of procurement, when the item is "dedicated" to a "basic component" (see 10 CFR 21.3(c-1) the item will become subject to the requirements of 10 CFR Part 21.[26]

In addition, the Commission reserved the right to inspect manufacturers/suppliers of commercial grade items where necessary to help identify defects reported by licensees and those suppliers covered by Part 21.[27]

The Commission also explained why it had not promulgated the amendments pursuant to the Administrative Procedure Act's notice and comment procedure:

> Since the amendments are intended, in part, to respond to a number of requests for exemptions from 10 CFR Part 21 which may be necessary to insure the continued availability of components for the nuclear industry and since the amendments narrow the scope of the regulation thereby relieving a restriction on persons subject to it, but without any significant adverse safety consequence, the Commission has found that good cause exists for omitting notice of proposed rulemaking and public procedure thereon as unnecessary.[28]

The Commission nevertheless invited public comment on the amendments and any other aspect of Part 21 in order to evaluate the need for further changes to the rule, noting that those comments received prior to December 18, 1978 would be "particularly useful."[29] The Commission eventually received nineteen comments, most of which sought confirmation that a particular item was a commercial grade item except from Part 21 until dedicated for use in a safety-related component.[30]

Only two commenters, the Union of Concerned Scientists ("UCS") and the Nuclear Resources Defense Council ("NRDC"), objected to the amendments. On October 25, 1978, UCS and NRDC filed a Freedom of Information Act request with the Commission, requesting all records relating to the need for the amendments and the need to bypass the notice and comment procedure.[31] The Commission provided 107 documents on November 15, 1978,[32] and turned over additional documents on January 3, 1979, while refusing to release others.[33] NRDC's administrative appeal produced one additional document on February 8, 1979.[34]

On March 2, 1979, NRDC and UCS filed comments on the amendments to Part 21 and a petition for rulemaking.[35] They requested that the Commission repeal the amendments to Part 21 and reimpose its original requirements.[36] They argued that the amendments were substantively unlawful because they conflicted with section 206, and procedurally unlawful because they

---

**26.** Under the amendments, dedication "occurs after receipt when that [commercial grade] item is designated for use as a basic component." 43 Fed.Reg. 48,622 (1978); 10 C.F.R. § 21.3(c-1) (1980).

**27.** 43 Fed.Reg. 48,621 (1978).

**28.** *Id.*

**29.** *Id.*

**30.** Brief for Respondents at 14.

**31.** *See* App. at 24–25.

**32.** *See* App. at 26–33.

**33.** *See* App. at 44–47.

**34.** *See* App. at 48–50.

**35.** App. at 9–23.

**36.** App. at 22. They also requested that all proposed regulations in the future be preceded by an advance notice of intent to develop a regulation, and that staff proposals for regulations trigger a Federal Register notice and opportunity for public comment. *Id.* After soliciting public comments, 44 Fed.Reg. 32,489 (1979), the Commission denied the request 45 Fed.Reg. 55,834 (1980). NRDC has not sought review of this ruling.

were promulgated without notice and comment.[37] On January 23, 1980, the Commission refused to rescind the amendments,[38] and NRDC petitioned for review of the Commission's order on March 24, 1980. In this court, NRDC argues that the Commission acted arbitrarily and capriciously when it refused to repeal amendments which, both as a matter of substance and procedure, were unlawful.

## II.

Although the Commission concedes this court's jurisdiction to hear NRDC's substantive attack on the amendments to Part 21,[39] it contends we lack jurisdiction to consider the claim that the Commission erred in promulgating the amendments without notice and comment. The Commission relies upon section 2344 of the Hobbs Act, which provides:

> On the entry of a final order reviewable under this chapter[40] the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, *within 60 days after its entry*, file a petition to review the order in the court of appeals wherein venue lies.[41]

The Commission concludes that NRDC's petition was untimely because it was filed some seventeen months after the Commission issued the amendments. According to the Commission, NRDC should have filed either a protective petition for review in this court or a petition for reconsideration with the Commission within sixty days of issuance of the amendments.

NRDC vigorously disagrees. NRDC insists it is not aggrieved by the October 1978 order promulgating the amendments but by the January 23, 1980 order denying its rulemaking petition and refusing to rescind the amendments. Because NRDC's petition for review of this order was filed within sixty days, and because its petition raised before the Commission the procedural ground asserted here, NRDC considers our jurisdiction to hear its procedural complaint clear.

We find the major premise of NRDC's argument somewhat disingenuous. It seems clear to us that NRDC is in reality aggrieved by the order promulgating the amendments to Part 21. *These* are the regulations that were promulgated without notice and comment. NRDC argued to the agency, and argues now to us, that the Commission's failure to permit notice and comment on *these regulations* was error. The problem, of course, is that the 60 day period for seeking direct review of the amendments expired long ago. The issue we face, therefore, is whether NRDC may now do indirectly what it is forbidden by statute from doing directly—that is, whether NRDC may now seek review of the procedure by which the amendments were promulgated, even though it could have but did not seek direct review thereof,[42] by simply

---

**37.** *See* App. at 10–22.

**38.** App. at 2.

**39.** Brief for Respondents at 26 n.17.

**40.** The order under review here is "reviewable under this chapter", 28 U.S.C. § 2344, because 28 U.S.C. § 2342 grants the courts of appeals "exclusive jurisdiction ... to determine the validity of ... all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42". Both parties agree that the order under review here was issued pursuant to 42 U.S.C. § 2239, which pertains to "any proceeding for the issuance ... of rules and regulations dealing with the activities of licensees".

**41.** 28 U.S.C. § 2344 (1976) (emphasis added).

**42.** NRDC contends that it could not petition for direct review of the order promulgating the amendments because it was not a party to the proceedings which gave birth to the order as required by the Hobbs Act. *See* 28 U.S.C. § 2344 (1976) ("Any *party* aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."); *Gage v. AEC*, 479 F.2d 1214 (D.C.Cir.1973). NRDC also claims that, under *Easton Utilities Commission v. AEC*, 424 F.2d 847 (D.C.Cir.1970), its non-party status barred it from petitioning the Commission for reconsideration.

We disagree. In *Gage* and *Easton*, we refused to recognize as "parties" those who had the opportunity to participate in the underlying Commission proceedings but who had failed to take advantage of it. In this case, however, since the amendments were promulgated with-

raising its objections in a petition for rule-making and seeking direct review of the order denying the petition.

■ We answer that question in the negative. The 60 day period for seeking judicial review set forth in the Hobbs Act is jurisdictional in nature, and may not be enlarged or altered by the courts.[43] This time limit, like other similar limitations, serves the important purpose of imparting finality into the administrative process, thereby conserving administrative resources and protecting the reliance interests of regulatees who conform their conduct to the regulations.[44] These policies would be frustrated if untimely procedural challenges could be revived by simply filing a petition for rulemaking requesting rescission of the regulations and then seeking direct review of the petition's denial. Indeed, the implications of the rule of law urged by the NRDC are staggering, for its logic knows no bounds; such a rule would permit procedural challenges to be brought twenty, thirty, or even forty years after the regulations were promulgated. No greater disregard for the principle of finality could be imagined.

■ We are aware that the right to petition for repeal of a rule is recognized by both the APA[45] and the Commission's rules.[46] We also acknowledge that we have scrutinized regulations immune from direct review by reviewing the denial of a subsequent rulemaking petition which challenged the regulations on demonstrable grounds of *substantive* invalidity.[47] For example, we have permitted such indirect challenges when an agency is alleged to have issued regulations which are not authorized by their parent legislation,[48] or when changed circumstances have allegedly deprived regulations of their factual foundation and have thereby brought them into conflict with such legislation.[49] NRDC has cited no case, however, and we are not aware of any, that has allowed the foregoing authority to permit back door procedural challenges by those who had the opportunity to seek direct review of regulations but failed to do so in a timely fashion.[50] We have previously suggested "that those who have had the opportunity to challenge general rules should not later be heard to complain of their invalidity on grounds fully known to

out notice and comment, there were no underlying proceedings in which the NRDC could join to obtain party status. To bar a petition for direct review because the petitioner was not a party to proceedings in which, by definition, it could not join would be to exalt literalism over common sense. We have refused to follow this course in the past, see *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 45–46 (D.C. Cir.1974), and decline to follow it now. Indeed, to bar direct review in such circumstances would create a dangerous precedent, for it would grant agencies the power to remove their regulations from direct review by simply promulgating them without notice and comment.

**43.** *Geller v. FCC*, 610 F.2d 973, 977 (D.C.Cir. 1979); *New York v. United States*, 568 F.2d 887, 892 (2d Cir. 1977); *B. J. McAdams, Inc. v. ICC*, 551 F.2d 1112, 1114 (8th Cir. 1977); *Chem-Haulers, Inc. v. United States*, 536 F.2d 610, 613–14 (5th Cir. 1976); *Microwave Communications, Inc. v. FCC*, 515 F.2d 385, 389–90 (D.C.Cir.1974).

**44.** *See Investment Co. Inst. v. Board of Gov. of Fed. Reserve Sys.*, 551 F.2d 1270, 1280 (D.C. Cir.1977).

**45.** 5 U.S.C. § 553(e) (1976) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.).

**46.** 10 C.F.R. § 2.802(a) (1980) ("Any interested person may petition the Commission to issue, amend, or rescind any regulation.").

**47.** *See, e.g., Geller v. FCC*, 610 F.2d 973 (D.C. Cir.1979); *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959); *see also Gage v. AEC*, 479 F.2d 1214, 1222 & n.27 (D.C. Cir.1973). *Cf. Investment Co. Inst. v. Board of Gov. of Fed. Reserve Sys.*, 551 F.2d 1270, 1280–82 (D.C.Cir.1977).

**48.** *E.g., Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959).

**49.** *E.g., Geller v. FCC*, 610 F.2d 973 (D.C.Cir. 1979).

**50.** Indeed, the case law suggests the opposite. *See Geller v. FCC*, 610 F.2d 973, 977 (D.C.Cir. 1979).

them at the time of their issuance." [51] With respect to routine procedural challenges made by those against whom the agency is not proceeding to enforce the regulation, we today elevate that suggestion into holding. We accordingly dismiss the petition for review for lack of jurisdiction insofar as it challenges the procedures used to promulgate the amendments to Part 21.

### III.

There remains the question whether the Commission erred in refusing to rescind the amendments to Part 21 in light of NRDC's substantive challenge thereto—that is, whether the Commission's action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to statutory, procedural or constitutional requirements.[52] Resolution of this issue necessarily turns on whether the amendments are inconsistent with section 206 of the Reorganization Act. NRDC insists they are, contending that Congress created section 206's reporting system to identify defects in all components that could have an effect on safety, and particularly in those components the amendments exempted until dedication from the reporting requirements—commercial grade items. Because the amendments conflict with section 206, NRDC reasons, the Commission acted arbitrarily and capriciously when it refused to rescind them.

The Commission argues that nothing in section 206 compels the conclusion that Congress intended it to apply to every component used in a safety-related system of a nuclear power plant. The Commission points out that Congress specifically left it to the Commission to determine what kinds of firms should be considered suppliers of "basic components" having substantial safety significance, and vested the Commission with the discretion necessary to perform this task. The Commission asserts that section 206 required it to draw a line somewhere to demarcate the outer boundaries of the duty to report, and concludes that the line it drew accords with the intent Congress expressed in section 206.

We find ourselves in essential agreement with the Commission. We conclude that the amendments to Part 21 cannot be said to be inconsistent with section 206, since they contravene neither the terse language of the statute nor its meager legislative history. We also rely on the principle that courts must give substantial deference to an agency's interpretation of a statute it administers.[53] This principle has even greater force when Congress has specifically left it to the agency to flesh out the terms of the statute. Indeed, the Supreme Court has instructed us to give particular deference to the construction of a statute advanced "by the men charged with the responsibility of setting its machinery in motion, [and] of making its parts work efficiently and smoothly while they are yet untried and new." [54] In this case, therefore, adherence to the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong" [55] requires us to

51. *Outward Continental N. Pac. Freight Conference v. FMC*, 385 F.2d 981, 982–83 n.3 (1967); *see also Pacific Coast European Conference v. FMC*, 376 F.2d 785, 787–788 & n.4 (1967).

52. *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C. Cir.1981).

53. *See, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *United States v. City of Chicago*, 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9 (1970); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965).

54. *Power Reactor Dev. Co. v. Electrical Workers Int'l Union*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933), in turn quoted in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

55. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (footnote omitted); *accord, New York Dep't. of Social Serv. v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973); *Columbia Broadcasting Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2095–96, 36 L.Ed.2d 772 (1973).

respect the judgment of the Commission. Because the amendments are consistent with section 206, it follows that the Commission's refusal to rescind them was neither arbitrary nor capricious.

We turn first to the language of the statute, "the most important manifestation of Congressional intent."[56] Section 206[57] provides:

(a) Any individual director, or responsible officer of a firm constructing, owning, operating, or supplying the components of any facility or activity which is licensed or otherwise regulated pursuant to the Atomic Energy Act of 1954 as amended, or pursuant to this chapter, who obtains information reasonably indicating that such facility or activity or basic components supplied to such facility or activity—

(1) fails to comply with the Atomic Energy Act of 1954, as amended, or any applicable rule, regulation, order, or license of the Commission relating to substantial safety hazards, or

(2) contains a defect which could create a substantial safety hazard, as defined by regulations which the Commission shall promulgate,

shall immediately notify the Commission of such failure to comply, or of such defect, unless such person has actual knowledge that the Commission has been adequately informed of such defect or failure to comply.

(b) Any person who knowingly and consciously fails to provide the notice required by subsection (a) of this section shall be subject to a civil penalty in an amount equal to the amount provided by section 2282 of this title.

(c) The requirements of this section shall be prominently posted on the premises of any facility licensed or otherwise regulated pursuant to the Atomic Energy Act of 1954, as amended.

(d) The Commission is authorized to conduct such reasonable inspections and other enforcement activities as needed to insure compliance with the provisions of this section.

Nothing in this language can be said to oblige the Commission to extend the statute's coverage, without interruption, to the bottommost tier of the procurement chain. The language merely provides that suppliers who learn of defects in "basic components" which could create a substantial safety hazard must report those defects to the Commission. Indeed, as the Commission points out, section 206's emphasis on the supplier's knowledge and state of mind indicates that Congress expected section 206 to cover those suppliers who were aware of the substantial safety function their products served in the workings of a basic component of a nuclear power plant. These persons are covered by virtue of the regulation including within the scope of part 21 those parts whose design or specifications are unique to nuclear power plants. Therefore, we cannot say that the language of section 206 contains any compelling indications that the interpretation of section 206 embodied in the amendments to Part 21 is wrong.

The same is true of the legislative history of section 206. The Senate Committee Report describes the purpose and scope of section 206 as follows:

The committee intends by this provision to upgrade the system of detecting and anticipating the defects that increasingly have plagued the nuclear power industry and threatens its safety record on a daily basis. The application of this provision to component suppliers is intended to benefit electric utilities in particular, which usually have no way of knowing that a sealed, prefabricated part is defective until it triggers a shutdown

---

**56.** Lawrence v. Staats, 640 F.2d 427 (D.C.Cir. 1981) (MacKinnon, J., concurring), citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *accord, Association of Bituminous Contractors v. Andrus*, 581 F.2d 853, 861 (D.C.Cir.1978) ("It is a funda-

mental rule, too often neglected, that in statutory construction the primary dispositive source of information is the wording of the statute itself.").

**57.** 42 U.S.C. § 5846 (1976).

costing tens of thousands of dollars a day in lost generating capacity.

\*　　\*　　\*　　\*　　\*　　\*

Component failures accounted for more than half of the 861 abnormal occurrences in nuclear power plants which were reported to the Atomic Energy Commission in 1973. Often the defective components were relatively noncomplex hardware items. For example, valves were the most frequent components involved in abnormal occurrences—amounting to 157 failures, or 19% of the total. Yet, the breakdown of a simple valve has potential catastrophic implications. The system most frequently involved in abnormal occurrences (210) was the primary cooling system which is used to prevent a meltdown of the nuclear core of a reactor. The system next most frequently affected by defects (166) was the emergency core cooling system which prevents a meltdown in case the primary cooling system fails. A meltdown is the worst conceivable reactor accident; according to testimony, such an accident could result in breaching of the containment vessel of a power plant and in the release of radioactive fallout equivalent to many Hiroshima bombs.

\*　　\*　　\*　　\*　　\*　　\*

. . . The committee intends, and the provision so states, that only "basic" components are covered by this requirement to report defects, as distinguished from incidental components unrelated to the safety of a nuclear facility.[58]

The Conference Report contains only one cryptic sentence on the subject:

Generally, [section 206] is directed toward assuring that the Commission has prompt information concerning defects in major components of facilities subject to licensing which could create a substantial safety hazard.[59]

Apart perhaps from manifesting an intent to include commercial grade items within section 206, at least at some point in the procurement chain, these brief passages contain no clear expression of the reach Congress intended section 206 to have. They certainly provide no concrete basis for striking down the Commission's interpretation of the statute.[60]

Other factors buttress our conclusion that the amendments to Part 21 are consistent with section 206. First, NRDC's objections to the exclusion of commercial grade items until dedication lose some force when considered against the background of other Commission procedures designed to ensure the safety of nuclear power plants. All commercial grade items, for example, are subject to the Commission's quality assurance regulations, which require nuclear power plant licensees to establish an effective program to make sure that all safety related components used in the plant are capable of meeting their operational requirements.[61] Second, we are influenced by the Commission's determination that amending Part 21 was necessary to give effect to the purpose of section 206—nuclear power plant safety. As the Commission explained in rejecting the staff's broad interpretation of the original Part 21 regulations:

The use of this meaning of basic components has not improved the quality of such items and, therefore, *has not enhanced safety.* Instead it is causing cost increases and inability to obtain needed supplies. To the extent that the purchaser is unable to obtain a needed item from the most qualified supplier and must turn to other less qualified suppliers, defining basic component to include [commercial grade items] may to some extent *detract from safety.* To relieve the conditions

---

**58.** S.Rep.No. 980, 93d Cong., 2d Sess. 67–70 (1974) U.S.Code Cong. & Admin.News 1974, p. 5528.

**59.** H.R.Rep.No. 1445, 93d Cong., 2d Sess. 37 (1974), U.S.Code Cong. & Admin.News 1974, p. 5550.

**60.** Since the issue is not before us, we pass no judgment on whether the terms of Part 21 as originally promulgated by the Commission did or did not accord with section 206.

**61.** *See* 10 C.F.R. Part 50, Appendix B (1980).

that are resulting from the above interpretation and to mitigate this potential *reduction of safety* part 21 is being amended....[62]

### IV.

For the foregoing reasons, the order under review is affirmed.

*Judgment accordingly.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in judgments reached in the majority opinion. As to the "procedural" claim, I agree that petitioner's long-delayed challenge to the procedures used by the NRC in adopting the October 1978 amendments to 10 C.F.R. Part 21 was untimely. Therefore, this court is without jurisdiction to hear or decide petitioner's claim that the challenged regulations are unlawful because they were issued without notice and comment.

As to the substantive claim, I concur in the judgment of the majority opinion because I believe that the NRC's denial of petitioner's request that the agency rescind the October 1978 amendments and reimpose the original requirements of Part 21 was "neither arbitrary, nor capricious, nor an abuse of discretion, or otherwise contrary to statutory, procedural or constitutional requirements." *WWHT, Inc. v. F.C.C.*, 656 F.2d 807, 819 No. 80–1613 (D.C.Cir.1981). I can find nothing in the literal language of section 206 of the Energy Reorganization Act to compel the result here sought by petitioners. Therefore, I believe that this court is obliged to respect "the broad discretionary powers possessed by administrative agencies to promulgate (or not promulgate) rules, and the narrow scope of review to which the exercise of that discretion is subjected." *Id.* at 818–19.

As I read the statute, the agency was authorized to adopt regulations in the form initially promulgated in Part 21 in 1977 or as subsequently amended in 1978. I do not read section 206 of the statute to compel or

bar either the original or amended regulations. In other words, both the original and amended versions of Part 21 were within the permissible range of agency discretion.

In light of certain arguments that were advanced during the presentation of this case, I am constrained to make two additional observations. First, I reject any suggestion that the Energy Reorganization Act and the accompanying legislative history compel a finding that section 206 is limited to "major components." Second, I also reject any suggestion that the section 206 cannot be read to cover "commercial grade" items at various tiers in the procurement chain. It is one thing to find that the agency's amended regulations in Part 21 are neither arbitrary, nor capricious, nor an abuse of discretion, nor otherwise contrary to law; it is quite another thing to suggest that section 206 applies only to noncommercial grade "major components." In light of the plain language in the statute, I cannot concur in the latter suggestion.

---

**62.** 43 Fed.Reg. 48,621 (1978) (emphasis added).