**STATE OF TEXAS, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 83–4318.

United States Court of Appeals, Fifth Circuit.

April 23, 1984.

John P. Fonte, John J. Powers, III, H. Glenn Scammel, Ernest B. Abbott, I.C.C., Dept. of Justice, Washington, D.C., for respondents.

Megan K. Ricke, Peter Mark Lee, St. Paul, Minn., for Burlington Northern, intervenor.

Before RUBIN, JOHNSON and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The State of Texas challenges the ICC requirement that it approve a tariff for intrastate contract carriage of wheat by rail that does not disclose the rate to be charged. Texas contends that the rate is an essential term of the contract and that disclosure of such an essential term is required by statute. It also seeks review of the ICC order putting the tariff into effect on various other grounds. We conclude that the ICC order was valid, and deny review.

I.

Burlington Northern Railroad Company filed with the Texas Railroad Commission and with the Interstate Commerce Commission a contract rate tariff for transporting wheat from origins in Texas, Kansas, and Oklahoma to Sherman, Texas. The Railroad Commission had jurisdiction over the Texas intrastate shipments while the ICC had jurisdiction over the interstate movements. The filing consisted of two documents, a contract summary and the complete contract. The summary, which is made available to the public under ICC rules, did not disclose all of the terms of the contract. It did not, for example, disclose the exact rates to be charged because the contract contained provisions for an allowance or discount to shippers based on annual volume and it disclosed neither the annual volume requirement nor the amount of the discount.[1] The contract contained,

Walter Davis, Asst. Atty. Gen., Austin, Tex., for petitioner.

1. The contract summary disclosed only the minimum annual volume requirement. Burlington Northern claims that the contract itself contains no further volume requirement.

of course, the full terms of Burlington's agreement with the shippers, but this document was confidential. The ICC had adopted a regulation permitting the omission of this information from summaries for both intrastate and interstate shipments.[2]

The Railroad Commission routed the Burlington Northern tariff to its Rail Rate Board, a staff level group, which examines rate filings to determine whether they satisfy the Railroad Commission's requirements. The Rate Board rejected the contract summary in a letter because the Interstate Commerce Act requires the summary to include all "essential terms of the contract,"[3] and the Rate Board considered the omitted information "essential." Texas contends that the Act requires a railroad to file three documents, not two: the contract itself, a contract summary, and a contract tariff. Texas contends that the essential terms of the contract, which include full information about the origin and destination of movements, their nature, and the actual rates to be charged, must be disclosed in the contract tariff.

Burlington sought reconsideration of the Rate Board decision by the Railroad Commission, but its petition has not been acted on. It also filed a petition with the ICC seeking reversal of the Railroad Commission decision in accordance with the procedure prescribed by statute,[4] which authorizes any railroad subject to ICC jurisdiction to seek ICC review of "the decision of any State authority ... on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of" the Act. The ICC decided that it had jurisdiction to review the rejection of Burlington's contract summary even though the Texas decision had been made by the Rate Board and not by the Railroad Commission. It reasoned that the Act gives it jurisdiction to review the "decision" of "any" state authority, the Rate Board's action was a "decision," and the Board is a state authority. The ICC next decided that it would not follow its usual practice and require Burlington to exhaust state administrative remedies. Finally the ICC decided that Burlington's contract summary complied with federal standards. It then authorized Burlington to put the proposed contract into effect. The State of Texas seeks judicial review of that order.

Texas asserts that the ICC had no jurisdiction to review the Rate Board's refusal to approve the Burlington tariff. If it had jurisdiction, Texas argues, the ICC is wrong in permitting a railroad to file a tariff that does not disclose the actual rates to be charged, for these are essential terms of the contract whose disclosure is required by the Act. Even if the ICC has read the Act correctly in regard to interstate rail contracts, Texas contends its reading is not binding on state authorities regulating intrastate rail traffic.

## II.

Until 1980 state regulatory bodies had initial responsibility for regulation of intrastate rail transportation. The ICC had power to preempt a state's authority and to prescribe an intrastate rate in only two situations: (1) when the rate unjustly discriminated against or imposed an undue burden on interstate commerce; or (2) when the state was dilatory in acting on a proposed rate charge.[5] Concerned about the "financial plight of the railroad industry,"[6] Congress determined that government regulation had "severely handicapped [railroads] in their ability to compete with

---

**2.** 49 C.F.R. § 1300.313 (1983). The ICC regulations require disclosure of the existence of a discount, but not of the amount. *Id.* § 1300.-313(a)(7). The contract itself may be inspected by parties who challenge the contract and who demonstrate that they are "likely to succeed on the merits" of their complaints. *Id.* § 1300.-310(b).

**3.** 49 U.S.C. § 10713(b) (Supp. V 1981).

**4.** 49 U.S.C. § 11501(c) (Supp. V 1981).

**5.** *See* 49 U.S.C. § 13(4), (5) (1976) (current version at 49 U.S.C. § 11501(a) (Supp. V 1981)).

**6.** H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 3979.

other modes of transportation."[7] Congress decided to reduce repetitive and conflicting state regulation, which it perceived to be a major contributor to the railroad industry's difficulties.[8] In the Staggers Rail Act of 1980,[9] therefore, Congress adopted a new rail transportation policy designed to reduce government regulation of the industry and to allow rail carriers to earn "adequate revenues."[10]

As part of its new transportation policy, Congress directed the ICC both "to cooperate with the States on transportation matters" and also "to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in" the Act.[11] The Act alters state jurisdiction in three interrelated ways.[12] It preempts all state jurisdiction over general rate increases.[13] It also prohibits a state from exercising any jurisdiction over intrastate rail transportation provided by an interstate rail carrier unless the state authority "exercises such jurisdiction exclusively in accordance with the provisions of" the Act.[14] The Act preempts all state regulation unless the ICC certifies that state standards and procedures are in accordance with the Act, and an uncertified state authority may not exercise any jurisdiction over intrastate rates.[15] In addition, any carrier providing interstate transportation

regulated by the ICC may petition the ICC "to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of" the Act.[16] The Commission must render a final decision on such a petition within thirty days, and "[i]f the Commission determines that the standards and procedures were not in accordance with the provisions of" the Act, "its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice."[17]

The Staggers Act also permits rail carriers, like other businesses, to conduct their operations by contract.[18] The use of contracts was intended to be "a significant aspect of the new freedom allowed to carriers to market rail transportation more effectively."[19] The Burlington contract was entered into under this provision.

### III.

Texas argues that the ICC lacked power to review the rejection of Burlington's contract both because no "decision" has been

7. *Id.* at 38, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 3983.

8. *Id.* at 128, 130, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4072, 4074.

9. Pub.L. No. 96–448, 94 Stat. 1895 (1980) (codified in scattered sections of 11, 45, and 49 U.S.C.).

10. 49 U.S.C. § 10101a(3) (Supp. V 1981).

11. *Id.* § 10101a(9).

12. *Id.* § 11501(b), (c).

13. 49 U.S.C. § 11501(b)(6). This originated as Section 214 of the Staggers Act.

14. *Id.* § 11501(b)(1).

15. *Id.* § 11501(b)(3)(A), (b)(4)(A). The Railroad Commission has been certified provisionally. Congress and the Commission had contemplated that the state certification process would take only 90 days. *Id.* § 11501(b)(3)(A). The Commission states that it and Congress underestimated the difficulties of ensuring that the standards and procedures of the many interested states were in accordance with federal law. Rather than revoke the jurisdiction of state authorities over intrastate rail rates at the end of the 90-day period, the Commission "provisionally certified" all states requesting certification to give them time to bring their standards into compliance. This included Texas. Ex parte 388, State Intrastate Rail Rate Authority, 46 Fed.Reg. 23,335 (April 24, 1981). The Railroad Commission still operates under this provisional certification.

16. 49 U.S.C. § 11501(c) (Supp. V 1981).

17. *Id.*

18. *Id.* § 10713.

19. H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4110, 4132.

issued and the action was not taken by a "state authority."

■ The Rate Board's letter decision was effective in preventing fulfillment of the proposed contract. It was binding on Burlington and the shippers. It was taken after deliberation. The Rate Board not only stated that in its view Burlington's tariff was defective, it refused to publish that tariff. Moreover, in imperative language, the Board ordered Burlington "to notify all subscribers served with the above-referenced filing that the proposed rates will not take effect as proposed and are not legally chargeable rates." The Rate Board itself labeled its written ruling a "first-level decision." While the label it chose to attach is not decisive, the written ruling was literally a "decision" by any definition of that term.

Next, Texas emphasizes that the Railroad Rate Board, not the Railroad Commission itself, rejected the tariff. It contends that only the Railroad Commission may be considered a "state authority."[20]

■ As the Commission noted in its opinion, the term "state authority" as used in the Act is inclusive. It is modified by the word "any" and thus refers not only to the state agency with final authority to act, "but to any unit of that agency that makes decisions attributable to" the state[21] that have the effect of refusing to approve a contract. Any other construction of the term "state authority" might permit a state to circumvent the ICC's jurisdiction simply by delegating its powers to a staff level body and then asserting that only its staff, and not the agency itself, had acted. Congress clearly did not intend that result.

In its letter decision, the Rate Board advised Burlington that "[t]he decision of the Board in this matter is subject to both administrative appeal at the Division level

and the filing of a Motion for Reconsideration with the Commission." Burlington filed a motion for reconsideration with the Rate Board and, at the same time, filed its petition with the ICC complaining that the state's action was contrary to the standards of federal law. The Railroad Commission stayed its reconsideration of the Burlington contract application pending ICC determination of Burlington's petition to it and has yet to act on the motion.

■ The Rate Board letter ruling was not a final decision. But ICC review is not limited by the Act to final decisions. The ICC stated in its opinion that it generally requires railroads to exhaust their remedies before state agencies, if the state's procedures are consistent with federal procedures. Nothing in the Act, however, exacts such exhaustion as a prerequisite to ICC review.

The ICC found that in this case postponement of a decision pending exhaustion of state administrative remedies "would serve no useful purpose."[22] Given the Railroad Commission's strenuous arguments on the merits, and its own contract rules, the ICC saw "little likelihood of RCT reversing the [Rate Board's] decision."[23]

The ICC also recognized that any postponement of a decision on Burlington's petition would be inconsistent with the Act, which allows the ICC only sixty days in which to approve or disapprove rail contracts[24] and consequently imposes this requirement as a federal standard on state regulatory agencies.

Finally, as the ICC found, the Railroad Commission had stayed its own administrative proceedings, which would have mooted this jurisdictional controversy, pending the ICC's action. This had "the appearance of deferring to [the ICC's] ... judgement [sic]."[25]

**20.** 49 U.S.C. § 11501(c) (Supp. V 1981).

**21.** Burlington Northern R.R., ICC Decision No. 39174, at 2 (Apr. 25, 1983).

**22.** *Id.*

**23.** *Id.*

**24.** 49 U.S.C. § 10713(e) (Supp. V 1981).

**25.** *Burlington Northern R.R.,* ICC Decision No. 39174, at 2 (Apr. 25, 1983).

The ICC asserts that the Railroad Commission itself had rejected a contract tariff of the Atchison, Topeka, and Santa Fe Railway Company on the same grounds at issue here. Moreover, Burlington and the ICC contend, the full Railroad Commission has since continued to reject railroad contract tariffs on the same grounds, forcing the ICC repeatedly to overrule its actions. Texas has not challenged these assertions. Indeed, on June 6, 1983, the Railroad Commission rejected a contract summary filed by Southern Pacific on the grounds that it did not adequately disclose rates, origins, or destinations. Predictably, the ICC overruled the Railroad Commission, and the state's petition for review has become a companion case to this one. *Texas v. United States,* 730 F.2d 420 (5th Cir.1984).

█ Burlington need not be required to make futile efforts to exhaust remedies or to await action that is so clearly forecast. Texas has not persuaded us that the ICC was wrong in deciding to review the action of the Rate Board.

### IV.

The ICC's contract rate rules were not adopted in this proceeding but in Ex parte 387, Railroad Transportation Contracts, 367 I.C.C. 9 (1982). The ICC contends that, insofar as the Railroad Commission's petition is an attack on the validity of the rules themselves, it comes too late and we lack jurisdiction to entertain it. Texas concedes that a direct attack on Ex parte 387 is now barred, but argues that we have jurisdiction to review the policy underlying the rules in the context of their application to the Burlington contract.

█ The Administrative Orders Review Act of 1950, known as the Hobbs Act, provides that a party aggrieved by a rule, regulation, or final order of the ICC must file a petition for judicial review within sixty days. 28 U.S.C. §§ 2342, 2344 (1976

& Supp. V 1981). This limitation is jurisdictional and cannot be judicially altered or expanded.[26]

█ Texas is now barred from attacking the procedure by which the contract rate rules were adopted. *See Natural Resources Defense Council v. Nuclear Regulatory Commission,* 666 F.2d 595 (D.C.Cir. 1981). The crux of the state's challenge, however, is to the substantive validity of the rules. When an agency applies a previously adopted rule in a particular case, the Hobbs Act does not bar judicial review of the substance of the rule, even if more than sixty days have elapsed since its issuance. *See id.* at 602; *Geller v. FCC,* 610 F.2d 973, 978 (D.C.Cir.1979) (per curiam); *Network Project v. FCC,* 511 F.2d 786, 789 n. 1 (D.C.Cir.1975). As the District of Columbia Circuit observed, in allowing an attack on FCC rules three years after their promulgation:

> As applied to rules and regulations, the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.[27]

█ The ICC argues that review of the rule "as applied" must be limited to an examination of whether "the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance." *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir. 1974). *Pacific Gas,* however, discusses the

---

**26.** *Illinois Central Gulf R.R. v. ICC,* 720 F.2d 958, 960 (7th Cir.1983); *Chem-Haulers, Inc. v. United States,* 536 F.2d 610, 613–14 (5th Cir.1976).

**27.** *Functional Music, Inc. v. FCC,* 274 F.2d 543, 546 (D.C.Cir.1958), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959).

extent of review of a rule in subsequent *administrative* proceedings. The ICC has cited no case indicating that such a restrictive standard applies to judicial review of an agency rule when later sought to be applied to a particular situation. Indeed, the cases suggest the opposite. Texas is not limited to an attempt to demonstrate special circumstances that qualify or alter application of the rule to the Burlington contract.

The ICC complains understandably about the state's dilatoriness in pursuing this petition for review. Notwithstanding its protestations to the contrary, Texas clearly had notice that the ICC contract rate rules would apply to intrastate as well as interstate commerce before those rules became final. Although the ICC's initial notice of interim contract rules was ambiguous in this regard,[28] Texas received ample warning that the rules under consideration might be so applied.[29] Despite this warning, Texas failed to participate in the rulemaking proceedings.[30] Texas also failed to seek intervention or file an amicus brief in a Second Circuit case directly reviewing the contract rate rules.[31] It has been suggested that "those who have had the opportunity to challenge general rules should not later be heard to complain of their invalidity on grounds fully known to them at the time of issuance."[32] Nevertheless, the Hobbs Act does not bar review of the underlying policy of a rule on these grounds.[33] We, therefore, have jurisdiction to consider the Railroad Commission's challenge to the substantive validity of the rules adopted in Ex parte 387.

## V.

Texas contends that the ICC misconstrued its statutory mandate when it required the filing of two documents rather than three, and when it decided that the Staggers Act did not require public disclosure of contract rates.

In concluding that actual contract rates should not be disclosed to the general public, the ICC balanced two congressional directives. On the one hand, the Act mandates that a contract summary should contain "such nonconfidential information as the Commission prescribes." 49 U.S.C. § 10713(b) (Supp. V 1981). The clear implication of this language is that certain contract terms are to remain undisclosed to

---

**28.** The ICC's notice of interim contract rules, published on November 5, 1980, certainly did not say that the proposed rules would apply to intrastate movements. *See* 45 Fed.Reg. 73,381 (1980) (to be codified at 49 C.F.R. §§ 1039, 1300).

**29.** The rules became final on November 4, 1982. On February 8, 1982, in its provisional certification of the Texas Railroad Commission, the ICC had informed Texas that its procedures required "excessive disclosure of contract rates." Ex parte 388, State Intrastate Rail Rate Authority (Feb. 8, 1982). On August 5, 1982, the ICC had cautioned states that had filed responses to the February 8 decision, including Texas, that they should "pattern their contract rules on those developed thus far by the Interstate Commerce Commission in Ex parte No. 387," and warned that, since the Ex parte 387 proceeding was not then complete, the states would be expected to alter their regulations, if necessary, in order to comply with the final results reached in that proceeding. State Intrastate Rail Rate Authority, 365 I.C.C. 855, 856 (1982). This was sufficient to remedy any defect in the original Ex parte 387 notice.

**30.** ICC regulations provide that "[a]ny person may participate in rulemaking proceedings by submitting written information or views." 49 C.F.R. § 1110.4 (1983). Even assuming that Texas was misled by the original notice and could not have filed comments by the deadline specified, December 22, 1980, it could have sought to file a late comment during the almost two-year pendency of the rulemaking proceeding. *See id.* § 1110.6.

**31.** *Water Transport Association v. ICC,* 722 F.2d 1025 (2d Cir.1983). *See* 28 U.S.C. §§ 2323, 2348 (1976); Fed.R.App.P. 29.

**32.** *Outward Continental N. Pac. Freight Conference v. Federal Maritime Comm'n,* 385 F.2d 981, 982–83 n. 3 (D.C.Cir.1967).

**33.** The District of Columbia Circuit has allowed a party who had filed objections during a rulemaking proceeding, but who had failed to petition for judicial review of the rulemaking proceeding itself, to attack the substantive validity of the rule when it was applied in subsequent proceedings. *Network Project v. FCC,* 511 F.2d 786 (D.C.Cir.1975).

the general public. On the other hand, this same provision directs the ICC to "assure that the essential terms of the contract are available to the general public in tariff format." *Id.* The ICC, therefore, was required to determine which terms were both essential and nonconfidential, making them subject to public disclosure.

Whether the statute contemplates the filing of two or three documents is not clear from its terms.[34] Whether two or three pieces of paper are filed is immaterial, provided that the "essential terms" of the contract are somehow made public. The ICC's interpretation of the statute to require only two filings is within its authority.[35]

The validity of the rules adopted in Ex parte 387 has been sustained by the Second Circuit in *Water Transport Association v. ICC*, 722 F.2d 1025 (2d Cir.1983).[36] We agree with the rationale of that case, and need not lengthen this opinion by reiterating its discussion. Instead we summarize its holding.

The statutory language does not define what contract terms are "essential" and the legislative history does not elucidate the term.[37] What is essential must be determined in the light of the structure and purpose of the Staggers Act, not by prior uses of the phrase "essential terms" or contract law definitions. The legislative purpose of disclosure is to provide information sufficient for the exercise of their rights to parties who have standing to contest the contract.[38] The ICC has balanced the need for confidentiality with the rights of parties to challenge contracts. The ICC rules do not manifestly vary from the statutory requirements.

Texas argues that the Second Circuit ignored legislative history demonstrating congressional intent to require disclosure of contract rates. It cites a statement in the Conference Report accompanying the Act to the effect that rail carriers who enter into contracts under the Act are "both common carriers and contract carriers."[39] Texas interprets this to mean that a railroad is a common carrier until its contract is approved by the ICC, and a contract carrier only thereafter. Like the ICC, we read the passage differently: it means that railroads are common carriers when they serve all comers at a general, publicly disclosed rate, and contract carriers when they enter into private contracts authorized by the Act. The latter interpretation of the statute is well within the ICC's discretion.

The document to which the public has access may not contain confidential carrier-shipper terms. The ICC determination that the price the shipper pays for the transport of its goods is confidential and need not be disclosed is one that, considering its expertise, it is better qualified to make than a federal court.[40]

### VI.

Even if the ICC's construction of the phrase "essential terms" was within the

---

**34.** 49 U.S.C. § 10713.

**35.** *Water Transport Association v. ICC*, 722 F.2d 1025, 1032 (2d Cir.1983).

**36.** The Second Circuit considered the ICC rules on disclosure at both the "first tier" (disclosure of "essential terms" to the general public) and the "second tier" (disclosure of additional contract terms to parties with standing to challenge particular contracts). The court upheld the validity of the ICC's first-tier rules, but remanded the second tier rules with instructions that the ICC make discovery easier for parties with standing to challenge contracts. *Water Transport Association*, 722 F.2d at 1032. The state's challenge here is limited to the ICC's first-tier rules.

**37.** *Water Transport Association*, 722 F.2d at 1031, and authorities cited therein.

**38.** *See supra* note 2. Shippers and ports are given standing to challenge rail contracts under 49 U.S.C. § 10713(d) (Supp. V 1981).

**39.** H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4110, 4132.

**40.** *See, e.g., FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23, 33 (1981); *Western Coal Traffic League v. United States,* 719 F.2d 772, 778 (5th Cir.1983) (en banc).

Commission's discretion, Texas contends, the ICC's interpretation is not binding on Texas because it is simply an agency rule rather than an explicit provision of the Staggers Act.

The Staggers Act provides that state authorities may exercise jurisdiction over intrastate transportation only if they do so "exclusively in accordance with the provisions of this subtitle." 49 U.S.C. § 11501(b)(1) (Supp. V 1981). Texas argues that "the provisions of this subtitle" are limited to explicit provisions of the Staggers Act itself and do not include rules and regulations promulgated by the ICC. Because the Act itself does not exempt contract rates from disclosure, Texas asserts, the states themselves are free to interpret the general provisions of the Act requiring disclosure of "essential" contract terms.

Two circuits have now rejected similar arguments. In *Illinois Central Gulf R.R. v. ICC*, 702 F.2d 111, 115 (7th Cir.1983), the Seventh Circuit held that "consistent rulings of the ICC must necessarily be incorporated and adhered to by state commissions exercising jurisdiction pursuant to the Staggers Act." Texas seeks to distinguish *Illinois Central Gulf* on the grounds that a long-standing ICC policy was at issue, rather than a recently adopted rule such as the one involved here.[41] But the Third Circuit has held that ICC standards and procedures recently promulgated to implement general terms of the Staggers Act are incorporated into that Act and thus binding on state authorities. *Wheeling-Pittsburgh Steel Corp. v. ICC*, 723 F.2d 346 (3d Cir.1983).

■ The Third Circuit's interpretation is supported by legislative history and by the language of the Act itself. The Conference Committee Report accompanying the Act indicates that Congress intended to

"ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals." H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 106, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4110, 4138. Furthermore, the Act itself requires the ICC to promulgate rules "to assure that the essential terms of the contract are available to the general public in tariff format." 49 U.S.C. § 10713(b) (Supp. V 1981).

If each state were free to define for itself what contract terms are "essential" and subject to disclosure, the congressional goal of federal uniformity would be undermined. The contract at issue in this case, for example, governs movements of wheat from origins both within and without Texas to destinations in Texas. If Texas were free to mandate disclosure of rates with respect to the commerce within Texas, over which it has jurisdiction, it would be a simple matter to extrapolate the rates applying to the interstate commerce, over which the ICC has exclusive jurisdiction. If Congress contemplated such inconsistencies between state and federal policies, it surely would not have conferred upon the ICC authority to determine whether state standards and procedures are in accordance with federal law. 49 U.S.C. § 11501(c) (Supp. V 1981).

■ Texas contends that our assessment of whether Congress intended to preempt state rules in this area should be colored by an awareness of the limitations on federal power imposed by the commerce clause and the tenth amendment. Preemption of state power by implication, Texas contends, is not favored. But congressional intent to preempt state authority could not be much more explicit than it is in this

---

**41.** The ICC argues, persuasively, that despite the relative youth of its contract rate rules, there is even more reason to incorporate them into the Act than the series of rulings at issue in *Illinois Central Gulf*. Whereas those rulings could be overruled by the ICC if the change in policy were adequately explained, *NLRB v. Haberman Constr. Co.*, 618 F.2d 288, 309 n. 22 (5th Cir.

1980), *modified,* 641 F.2d 351 (5th Cir.1981) (en banc), the contract rate rules can be overturned or modified only after the ICC conducts a new informal rulemaking proceeding with notice and an opportunity for public comment. *Consumer Energy Council v. FERC,* 673 F.2d 425, 446 (D.C.Cir.1982), *aff'd mem.,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

instance. As we have noted, Congress preempted all state jurisdiction over general rate increases and prohibited a state from exercising any jurisdiction over intrastate rail transportation unless it does so "exclusively in accordance with the provisions" of the Act, as determined by the ICC. That Congress did not explicitly mandate the confidentiality of contract rates does not contravene other clear evidence of legislative intent to preempt general state authority over disclosure of contract terms, when such authority is inconsistent with federal standards.[42]

Finally, Texas asserts that the ICC has defaulted on its responsibility to provide clear standards for the states, rendering its initial, provisional certification of the Texas Railroad Commission invalid. Until the ICC initially certifies a state authority, the state standards and procedures in effect on the effective date of the Act "shall be deemed to be certified" by the ICC. 49 U.S.C. § 11501(b)(3)(B) (Supp. V 1981). Texas contends, therefore, that the Railroad Commission standards and procedures that were previously in effect should be "deemed certified." In support of this argument, Texas relies on *Kentucky Utilities Co. v. ICC*, 721 F.2d 537 (6th Cir.1983). *Kentucky Utilities*, however, is of limited relevance to the instant case. The Sixth Circuit found that the ICC had circulated to the states a series of interim guidelines instead of providing a single clear standard for ratemaking, obligating the states to "apply any new rate theory currently in vogue at the ICC." 721 F.2d at 544. In this case, the ICC rules on rate disclosure were final on November 4, 1982, and by that time it was clear that the ICC meant them to be binding on state authorities. The Rail Rate Board determination that Burlington's contract was defective was is-

sued on March 9, 1983, long after the ICC had provided the states with clear guidance on rate disclosure. Furthermore, even if the ICC's provisional certification of Texas were invalidated,[43] the ICC would still have jurisdiction to determine whether the state's standards were "in accordance with the provisions of this subtitle." 49 U.S.C. § 11501(c) (Supp. V 1981).

## VII.

Among the goals of the Staggers Act were those of establishing uniform federal regulation of railroad traffic and of allowing rail carriers to emulate, at least to some degree, the contractual relationships of unregulated businesses. In the light of these legislative goals, the ICC rules allowing contract rail carriers and shippers to maintain the confidentiality of contract rates are well within its discretion to interpret the statutory phrase, "essential terms of the contract." Adopted in accordance with the Staggers Act, these rules are themselves a part of the federal law, and state authorities exercising jurisdiction over intrastate commerce conducted by interstate carriers must exercise such jurisdiction only in accordance with them. The Texas rules mandating disclosure of actual rates are fundamentally inconsistent with the ICC rules allowing confidentiality. The petition of the State of Texas for review is, therefore, DENIED.

---

**42.** Texas also challenges the Staggers Act as unconstitutional under the commerce clause and the tenth amendment. That contention has been rejected by another panel of this circuit. *Texas v. United States*, 730 F.2d 420 (5th Cir. 1984). A facial challenge to the Staggers Act must, in any event, originate in a district court, not in a court of appeals. 28 U.S.C. §§ 1331, 1337 (1976 & Supp. V 1981).

**43.** The Seventh Circuit has held that the ICC's decision to certify state authorities conditionally was a valid exercise of its discretion. *Illinois Central Gulf R.R. v. ICC*, 720 F.2d 958 (7th Cir.1983). *See also supra* note 15.