William Roy CHRITTON, Jr.,
Petitioner,

v.

NATIONAL TRANSPORTATION SAFE-
TY BOARD, Samuel K. Skinner, Secre-
tary of Transportation, and T. Allan
McArtor, Administrator, Federal Avia-
tion Administration, Respondents.

No. 88–1123.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1989.

Decided Oct. 27, 1989.

James E. Cooling, with whom Paul King-solver was on the brief for petitioner.

Karen R. Bury, Atty., F.A.A., for respondents. Peter J. Lynch, Atty., F.A.A., also entered an appearance for respondents.

Before MIKVA and RUTH BADER GINSBURG, Circuit Judges, and HOGAN,* District Judge.

Opinion for the Court filed by District Judge HOGAN.

THOMAS F. HOGAN, District Judge:

Petitioner William Roy Chritton, Jr., an emergency medical evacuation helicopter pilot, crashed in bad weather by hitting a power line while he was transporting an accident victim. Petitioner seeks review of an order of the National Transportation Safety Board ("NTSB" or "Board"), affirming an order of the Federal Aviation Administration ("FAA"), which suspended his commercial pilot certificate for twenty days because of the crash. Petitioner contends

---

* The Honorable Thomas F. Hogan of the United States District Court for the District of Colum-

bia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

on appeal that the agency improperly found him in violation of Federal Aviation Regulations and arbitrarily rejected his "emergency" defense. For the reasons set forth below, we affirm.

## I. BACKGROUND

Mr. Chritton is a professional pilot and a founder and chief helicopter pilot of Air Evac EMS, Inc., a private emergency medical service operating out of Ozark Medical Center in West Plains, Missouri. The incident giving rise to this appeal occurred on October 31, 1985, when Mr. Chritton, conducting an air ambulance flight, attempted to transport a seriously-injured accident victim and a paramedic from the Ozark Medical Center to a hospital in Springfield, Missouri, under adverse weather conditions. Concerned about the weather, Mr. Chritton chose a flight course following Interstate Highway 60 at low altitude in order to maintain reference to ground lights and to retain access to ground transportation to nearby hospitals. Before reaching Springfield, he encountered Cedar Gap Hill, the highest elevation on Highway 60. At Cedar Gap Hill, visibility in the fog

became so poor that Mr. Chritton decided to turn around and take the patient to a hospital in Mansfield, a city he had just passed. In making the 180–degree turn, the helicopter hit power lines that paralleled the highway and crashed on the highway median strip. Mr. Chritton and the paramedic sustained injuries as a result of the crash. The patient was found dead at the scene.

On July 21, 1986, the FAA issued an order suspending Mr. Chritton's commercial pilot certificate for sixty days for violations of Federal Aviation Regulations ("FAR"), 14 C.F.R. §§ 91.79(a), 91.79(d), 91.9, and 91.105(b).[1] Mr. Chritton appealed the order to the NTSB, requesting a hearing. An evidentiary hearing was held before NTSB administrative law judge ("ALJ") Thomas W. Reilly on January 6, 1987. Eleven witnesses appeared.[2]

At the conclusion of the FAA's case in chief, Judge Reilly dismissed the charged violations of FAR sections 91.79(a) and 91.-105(b). At the conclusion of all the evidence, Judge Reilly affirmed the Administrator's order regarding violations of FAR sections 91.79(d) and 91.9, rejected Mr.

---

**1.** Those FAR sections provide in relevant part:
*Minimum safe altitudes; general.*
   Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
   (a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.
   . . . .
   (d) *Helicopters.* Helicopters may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section if the operation is conducted without hazard to persons or property on the surface. In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the Administrator.
14 C.F.R. § 91.79(a), (d).
*Careless or reckless operation.*
No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.
*Id.* at § 91.9.
*Basic VFR weather minimums.*
   . . . .
   (b) When the visibility is less than one mile, a helicopter may be operated outside controlled airspace at 1,200 feet or less above the surface if operated at a speed that allows the

pilot adequate opportunity to see any air traffic or other obstruction in time to avoid a collision.
*Id.* at § 91.105(b).

**2.** At the hearing, the Federal Aviation Administration ("FAA") presented testimony from the following witnesses: Billy Parsons, a truck driver on Highway 60 who saw the helicopter crash; David Hall, a motorist driving along Highway 60 at the time of the crash; Sergeant Mike Zorsch, of the Missouri State Highway Patrol, who arrived at the accident scene shortly after the crash; Judith Malloy, the FAA Flight Service Specialist who provided Mr. Chritton with weather reports prior to the flight; and Harold Cornine, the FAA Aviation Safety Inspector who investigated the incident for the FAA.
   Mr. Chritton then testified on his own behalf, and called the following witness: Ronald Correira, a motorist traveling on Highway 60 at the time of the accident; Terry Kenslow, a Deputy Sheriff who arrived at the scene after the accident; Gary Frazier, a co-founder of the Air Evac emergency helicopter service; and Dan Vallee, the paramedic on board the aircraft.
   Finally, the FAA presented rebuttal testimony from Charles Arnold, Manager of the FAA Engineering Flight Test Section and an experienced helicopter pilot.

Chritton's "emergency defense" under FAR section 91.3(b)[3], and reduced the sanction to a twenty-day suspension. Mr. Chritton then appealed from Judge Reilly's initial decision to the full NTSB. On December 21, 1987, the NTSB issued an opinion and order denying Mr. Chritton's appeal and affirming Judge Reilly's initial decision. Mr. Chritton now seeks review of the NTSB's decision pursuant to 49 U.S.C.App. §§ 1486(a) and 1903(d) (1982).[4] The Board's order has been stayed pending disposition of this appeal.

## II. DISCUSSION

In reviewing the decision of the NTSB, we are bound by the provisions of the APA. Under 49 U.S.C.App. § 1903(d) and 5 U.S.C. § 706(2)(E), the reviewing court shall set aside agency findings unsupported by substantial evidence. The substantial evidence test is a narrow standard of review. Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Refrigerated Transport Co., Inc. v. I.C.C.*, 616 F.2d 748, 751 (5th Cir.1980) (quoting *Chem–Haulers, Inc. v. United States*, 536 F.2d 610, 617 (5th Cir.1976)). Under the substantial evidence test, the court must determine whether " 'the agency . . . could fairly and reasonably find the facts as it did.' " *Western Air Line, Inc. v. C.A.B.*, 495 F.2d 145, 152 (D.C.Cir.1974) (quoting *Braniff Airways, Inc. v. C.A.B.*, 379 F.2d 453, 462 (1967)). Thus, a "conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Id.*

In addition, pursuant to 5 U.S.C. § 706(2)(A), the reviewing court shall hold

unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Under this standard, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Thus, when reviewing an agency decision under the "arbitrary and capricious" standard, we must defer to the wisdom of the agency, provided its decision is reasoned and rational, and even "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation Inc. v. Arkansas–Best Freight Systems Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 441, 442, 42 L.Ed.2d 447 (1974) (citing *Colorado Interstate Gas Co. v. F.P.C.*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)).

In his petition for review, Mr. Chritton challenges the action of the Board on two grounds. First, he argues that the Board's findings of pilot negligence, and the resultant findings of violations of FAR sections 91.79(d) and 91.9, are unsupported by substantial evidence. Second, petitioner claims that the NTSB's rejection of Mr. Chritton's "emergency defense" under FAR section 91.3(b) to his alleged violations of FAR sections 91.79(d) and 91.9 was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. We address petitioner's claims seriatim.

---

**3.** 14 C.F.R. § 91.3 states in pertinent part:
*Responsibility and authority of the pilot in command.*

. . . .

(b) In an emergency requiring immediate action, the pilot in command may deviate from any rule of this subpart or of Subpart B to the extent required to meet that emergency.

**4.** Section 1903(d) provides:
*Judicial Review.* Any order, affirmative or negative, issued by the Board under this title

shall be subject to review by the appropriate court of appeals of the United States or the United States Court of Appeals for the District of Columbia, upon petition filed within 60 days after entry of such order, by any person disclosing substantial interest in such order. Such review shall be conducted in accordance with the provisions of chapter 7 of title 5 of the United States Code [the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) and (E)].

### A. NTSB's Finding of Pilot Negligence

■ The NTSB's finding of pilot negligence was based principally on its conclusion that both the existence of the power lines and the adverse weather conditions that Mr. Chritton encountered were "foreseeable." The Board adopted the ALJ's factual findings and agreed that there was "no merit in [Mr. Chritton's] contention that the striking of power lines by the helicopter was an unforeseeable event." *Administrator v. Chritton*, NTSB Order No. SE–7639, slip op. at 6 (1987) (hereinafter "NTSB Opinion"). The Board also agreed with the ALJ that Mr. Chritton "had weather information, in the form of current reported weather observations, sufficient to apprise him that there would be fog and obscuration along the route to Springfield." *Id.*, slip op. at 7.

The Board reasoned as follows:

[Mr. Chritton's] helicopter finally came to rest on ... a section clearly marked by the presence of power lines. We also note that the altitude for the quadrangle within which the accident occurred is marked at 3700 feet and the area surrounding the accident site has numerous altitude markers. In short, *the power lines and altitudes are clearly delineated on the chart, which, respondent testified, he was using* (Tr. p. 314). The Board concurs in the law judge's determination that, although [Mr. Chritton] could not tell the height of the power lines depicted on the chart, and he could not see the power line because, being night, it was dark, and, as forecast, it was foggy, it was incumbent upon [Mr. Chritton] to fly high enough to avoid obstructions that would otherwise be there for him to see in daylight and with unobstructed visibility. In short, the law judge found that *a prudent pilot would have foreseen the possibility that the power lines marked on the chart would require him to maintain an altitude significantly higher than the surrounding terrain because the power lines would not be visible in darkness and obscuration.*

Secondly, the Board agrees with the law judge that [Mr. Chritton's] inability or failure to obtain the latest weather forecast at 6:06 p.m., on his second request for weather information, was not crucial because the current reported weather observations, given at 5:12 p.m. and at 6:06 p.m., were both below the forecasted conditions. The Administrator points out that the reported weather conditions (which had not changed for at least two successive hourly reports), were well below the amended forecast....

We also note, as did the law judge, that it appears that the fogging of respondent's helicopter bubble, which had also occurred earlier in the flight, was a factor that contributed to his loss of visibility.... Moreover, respondent testified that he knows what a temperature-dew point ratio of 47°–46° signifies and that it was his opinion, from the two current weather observations he obtained, that weather conditions were deteriorating.... As it turned out, at the time of the crash, it was dark, there was rain and drizzle, the bubble had fogged over, and respondent found himself in a sloping bank of clouds ..., *not unforeseeable* on the basis of the two recent weather observations he had obtained.

NTSB Opinion, slip op. at 6–8 (emphasis added).

The Board's findings regarding the foreseeability of the power lines are supported by substantial evidence. Mr. Chritton himself testified before the ALJ that the power lines were marked on the chart he used in flight and that he knew the lines crossed the highway in the area of the crash because he had driven the route before. Appendix (hereinafter "App.") at 446–447. In addition, Charles Arnold, Manager of the FAA Engineering Flight Test Section and an experienced helicopter pilot, testified that according to the map, the crash area was "bristling with obstructions, hill tops, antennas, power lines, although they may not have been known specifically, ... the altitudes that were evident on the map, would clearly indicate, not going below a certain altitude for fear of hitting those

obstacles." App. at 468. On this record, the Board reasonably concluded that Mr. Chritton's encounter with the power lines was foreseeable and that he could have avoided the lines had he exercised due care.

The record also reveals that prior to commencing the flight, Mr. Chritton called the FAA Flight Service Station ("FSS") at Springfield for weather briefings twice, once at 5:12 P.M. and once at 6:06 P.M. During the first call, FAA Flight Service Specialist Judith Malloy gave Mr. Chritton the following report of current conditions: measured cloud ceiling of 400 feet broken, 700 feet overcast; visibility of 1.5 miles; light drizzle and fog; temperature 47 degrees, and dew point 46 degrees.[5] App. at 228–229, 549–552. In addition, during the first call, Ms. Malloy reported the following forecast of future conditions: 600–foot overcast ceiling, visibility 5 miles in fog, with occasional ceilings of up to 1000 feet. *Id.* at 235–236, 549–552. After giving the forecast, however, Ms. Malloy cautioned that she believed the weather would deteriorate, rather than improve as forecasted, as fog was visible outside her window. Mr. Chritton concurred, stating that he "wouldnt [sic] expect you to ever get any better than you are now...." *Id.* at 550.

During the second call, Mr. Chritton received an identical report of current conditions and stated that "[t]hat dew point temperature spread scares me." *Id.* at 551. Mr. Chritton did not request a forecast during the second call. In fact, however, an updated weather observation and forecast had been issued shortly before Mr. Chritton's second call. The new weather report indicated unchanged cloud ceilings and improved visibility of 3 miles. The updated forecast, on the other hand, called for a 500–foot overcast cloud ceiling, visibility of 1.5 miles, light drizzle and fog, with occasional ceilings of 1000 feet overcast. Neither the amended observation nor

the amended forecast were made available to Mr. Chritton during the second call.

Despite his own observations of "marginal" weather, *id.* at 391–392, and the disturbing weather reports, Mr. Chritton decided to take the flight. Mr. Chritton testified that as he climbed to 2200 feet MSL (Mean Sea Level) he began to experience fogging in the helicopter bubble. As he approached Mansfield, the rain increased, conditions deteriorated, and he "[began] to believe that the temperature-dew point spread was catching up with [us]." *Id.* at 404. Mr. Chritton conveyed his concern to the paramedic on board, as he testified:

A. I commented to Dan Vallee, the paramedic, we're coming up on Mansfield Hospital ahead and it seems to me the weather is deteriorating. I don't believe we're ever going to be able to get over the hill ahead, referring to the Cedar Gap, and we probably ought to land him right here at Mansfield.

....

A. I said [to Mr. Vallee] well, we're still good enough here that we can continue flying and we can go a few miles further, but I've got a feeling that we're going to have to turn back to Mansfield and we're going to have to put [the patient] down at Mansfield.

*Id.* at 405.

Mr. Chritton further testified that at that point the weather improved; the rain stopped and visibility increased to 10 miles. He proceeded to climb 100 feet. *Id.* at 406. Shortly thereafter, however, Mr. Chritton "started hitting [a] sloping cloud bank," so he "lowered the collective [*i.e.*, descended], went a little further, hit a little more, lowered it more." *Id.* at 411. He stated that at this point he knew he was in the vicinity of Cedar Gap. The rain and fog increased and he commented to the paramedic "we're going to have to turn around and go back to Mansfield." *Id.* at 414. Finally, Mr. Chritton testified that as he prepared to

---

5. At the hearing Harold Cornine, the FAA Aviation Safety Inspector who investigated the incident, testified that when the temperature-dew point spread is five degrees or less, there is a probability of fog formation; when it is less than three degrees, the probability is very high; and with a one degree spread, plus existing fog, low ceilings, and precipitation, as existed on the night in question, a pilot would "most certainly" experience some seriously restricted visibility. App. at 277.

turn he began descending and he "was worried about ... [the] high terrain." *Id.* at 415. It was at this time that the lower left skid of the helicopter caught the wire and the aircraft crashed.

In addition to Mr. Chritton, a number of other witnesses testified as to the weather conditions on the night in question. Billy Parsons, a truck driver who witnessed the crash, testified that the weather between Springfield and the crash site was "misty rain and fog all the way." *Id.* at 162. David Hall, another motorist on Highway 60, testified that there was "medium fog" at the time of the crash. *Id.* at 174. Sergeant Mike Zorsch of the Missouri State Highway Patrol testified that the fog bank surrounding the accident site was approximately 2 to 2.5 miles wide. *Id.* at 203.

Finally, two witnesses testified as to their opinions regarding Mr. Chritton's decision to continue toward Springfield and delay turning back when he encountered adverse weather. FAA Aviation Safety Inspector Harold Cornine testified that in his opinion Mr. Chritton's operation of the flight was careless. Mr. Cornine questioned whether Mr. Chritton had analyzed the weather correctly for the particular route of flight given the high terrain, reduced visibility, low ceilings, rain, and fog, and concluded that "it's just a very risky operation all the way along, and in my opinion ... the decision to turn around was a good decision but it was reached too late." *Id.* at 299–311. Mr. Charles Arnold, an experienced helicopter pilot who manages the FAA Engineering Flight Test Section, also testified that in his opinion "it was simply a lack of adequate planning, a lack of perhaps good judgment, that allowed this flight to continue[] until such time as the wire stand cause[d] the accident." *Id.* at 468.

Based on these findings the Board upheld the ALJ's decision holding petitioner in violation of FAR sections 91.79(d) and 91.9. Contrary to Mr. Chritton's arguments, neither the Board nor the ALJ held that Mr. Chritton's negligence was in taking off *per se,* but in going "beyond the limit of what prudence would dictate" and

failing to "avoid known or foreseeable circumstances." *Administrator v. Chritton,* NTSB Initial Decision, Docket No. SE–7639 (1987) (hereinafter "ALJ Opinion"), App. at 401–402. As the ALJ explained:

I think it was ... *at some point in the flight,* although we may not be able to point to it with the precision of what foot or what mile or what particular hundred yards [this judgment failure occurred].

Sometime prior to getting down, anywhere near the elevation of this terrain, and *knowing that there were power lines* in the general area, he should have [turned around or landed at his alternate (Mansfield)] *and knowing that there were fog conditions,* at least intermittent, and also an unreliable cloud deck coming down, disappearing completely, appearing again, lowering and slanting, sloping, somewhere in there prior to this wire strike, I think *[Mr. Chritton] exceeded the bounds of prudent pilot operation.*

ALJ Opinion at 402–403 (emphasis added).

The ALJ's ruling, as adopted by the Board, was in accordance with the law. The Board reasonably found that Mr. Chritton operated the helicopter at an altitude that created a hazard to persons and property on the surface, in violation of FAR section 91.79(d), and that he operated the aircraft in a careless manner so as to endanger the lives and property of others, in violation of FAR section 91.9. It is not necessary that the Board pinpoint exactly when and where petitioner's negligence occurred. *See Pangburn v. C.A.B.,* 311 F.2d 349, 352 (1st Cir.1962). Rather, it is adequate that the Board find that Mr. Chritton was aware of the location of the power lines, that based on the weather information he obtained prior to flight and observed during flight, Mr. Chritton could have foreseen the adverse weather conditions that he encountered prior to the crash, and could have avoided the hazards resulting in the crash had he exercised due care.

Finally, the Board's finding of negligence is in accordance with the law, notwithstanding the fact that Chritton could not see the

lines that he hit. As the Board held in *Administrator v. Christopherson*, NTSB Order No. EA–2278 (1986), a case involving a helicopter collision with unmarked power lines, "the fact that the lines were difficult to detect does not excuse the violations. On the contrary, for this very reason [the pilot] should have maintained a higher altitude through an area where he knew or should have known, as clearly depicted in the chart, ... the lines [existed]." *Christopherson*, slip op. at 5. As in *Christopherson*, the Board here reasonably concluded that a pilot created an unacceptable risk that he would not be able to see and avoid power lines when he flew at an unreasonably low altitude. The Board thus acted in accordance with the law in holding Chritton in violation of FAR sections 91.-79(d) and 91.9.

### B. NTSB's Rejection of the Emergency Defense Under FAR Section 91.3(b)

■ Mr. Chritton further argues that even if the Board properly concluded that he violated FAR sections 91.79(d) and 91.9, the emergency defense incorporated in section 91.3(b) excuses his conduct and shields him from sanctions. In relevant part, section 91.3 provides that:

> [in] an emergency requiring immediate action, the pilot in command may deviate from any rule of this subpart or of Subpart B to the extent required to meet that emergency.

14 C.F.R. § 91.3(b). The Board rejected Mr. Chritton's reliance on the defense, deeming it inappropriate to the facts of this case. Petitioner appeals the NTSB ruling on this issue, arguing that the Board's failure to apply the emergency defense was arbitrary, capricious, and otherwise not in accordance with the law.

The Board's direct references to the emergency defense are limited to two nonsequential paragraphs of the opinion. The Board first refers to the emergency defense when it summarizes the Administrator's argument:

> The Administrator contends that FAR Section 91.3(b) is not applicable in the instant case because it provides that, in

an emergency requiring immediate action, a pilot may deviate from an operating rule of FAR Part 91 to the extent required to meet that emergency, and the emergency in this case, i.e., the take-off into adverse weather that culminated in flight at an altitude insufficient to clear an obstacle depicted on the sectional, was not unforeseeable but, rather, was of the pilot's own making and thus not a defense to the charges.

NTSB Opinion, slip op. at 5. The second reference to the defense occurs in the concluding paragraph of the Board's opinion:

> [Mr. Chritton] further contends that, if he violated any FAR, such violation was necessary to meet an emergency situation not of his own making. The law judge did not agree nor does the Board. [Mr. Chritton] is not excused under FAR Section 91.3(b) ... because [Mr. Chritton's] passenger's need for immediate medical attention is not the type of emergency that is contemplated by FAR Section 91.3(b). The kind of emergency to which Section 91.3(b) refers is an inflight emergency that requires immediate action. Moreover, the temporary suspension of the effectivity of the operating rules of FAR Part 91, for the duration of the emergency itself, is not intended to extend to an entire flight operation but only to an unforeseeable condition that arises after takeoff. In any event, respondent cannot be released from the regulation that requires him to remain clear of obstructions to safe flight even in an inflight emergency.

*Id.* at 8. In the intervening paragraphs between these two references, the Board reviews the ALJ's factual findings and concludes that both the power lines and the weather conditions that petitioner encountered prior to the crash were foreseeable. *Id.* at 5–8.

Mr. Chritton contends that the Board "entirely misstated the issue presented on appeal concerning the application of the emergency defense." Petitioner's Brief at 24. Mr. Chritton argues that the Board erroneously focused solely on the purpose of the flight, while petitioner "has always

asserted that the emergency was created by adverse weather *in combination* with the life saving purpose of the flight." *Id.* (emphasis in original) Specifically, petitioner claims that "[s]ince adverse weather conditions have been held previously by the Board to constitute an emergency situation, that defense is clearly available in response to a charge of creating a collision hazard, despite the Board's statement to the contrary." *Id.* at 31.

Mr. Chritton's interpretation of the Board's decision is misguided. The Board directly addresses both the weather and the purpose of the flight in its summary of the Administrator's contentions. NTSB Opinion, slip op. at 5. The Board then concludes that the weather conditions petitioner encountered were foreseeable. *Id.*, slip op. at 8. A careful reading of the Board's opinion reveals that rather than ignoring Mr. Chritton's claim that the emergency defense applies to bad weather conditions, the Board addresses it, dismisses it on the grounds that the adverse weather was foreseeable, and then turns its attention to petitioner's remaining claim that the defense is triggered by the passenger's need for immediate medical attention—the sole situation which was not "of [petitioner's] own making." *Id.*

Given the Board's factual findings that both the adverse weather and the proximity of the power lines were foreseeable, the Board's rejection of the emergency defense is clearly in accordance with the law. It is a basic principle of tort law that the "'emergency doctrine' is applied only where the situation which arises is sudden and unexpected.... [I]t obviously cannot serve to excuse the actor when the emergency has been created through his own negligence, since he cannot be permitted to shield himself behind a situation resulting from his own fault." W. Prosser, *Law of Torts* § 33 at 169–170 (4th ed. 1971) (citations omitted). Not surprisingly, the NTSB has similarly long held that only *unforeseeable* adverse weather can constitute an emergency triggering the defense. *E.g., Administrator v. Austin,* 2 N.T.S.B. 662, 663 (1974) ("It is well settled that the exculpatory effect of Section 91.3(b) is applicable only when the ... weather conditions in which a pilot finds himself [are] unforeseeable and not avoidable by the exercise of sound judgment before and during the flight"); *Administrator v. Clark,* 2 N.T.S.B. 2015, 2018 (1976) (non–IFR [instrument flight rules] rated pilot's flight through IFR conditions excused under § 91.3(b) when pilot encountered unexpected weather conditions and the emergency was not of the pilot's own making); *Administrator v. Morrison,* 1 N.T.S.B. 160, 162 (1968) (unforeseeable weather conditions constitute an emergency under § 91.3(b) and excuse deviations from pertinent safety regulations); *Administrator v. Mason,* 2 N.T.S.B. 89, 91 (1973) (emergency defense held inapplicable when deteriorating weather conditions were foreseeable and could have been avoided by the exercise of due care); *Administrator v. Sidicane,* 3 N.T.S.B. 2447, 2450 (1980), *appeal denied,* 698 F.2d 1223 (6th Cir.1982) (emergency defense rejected when pilot could have reasonably expected to encounter adverse weather).

We hold that the Board reasonably rejected the emergency defense as applied to the adverse weather conditions on the grounds that Mr. Chritton should have reasonably foreseen the bad weather conditions he encountered. The record supports the finding that he had the opportunity to execute a 180–degree turn before he reached the crest of Cedar Gap Hill. Having put himself in the very predicament that resulted in the accident, he "cannot avail himself of the defense of an emergency which he could have and should have avoided." *Administrator v. Austin,* 2 N.T.S.B. at 663–664.

█ The Board also correctly concluded that "[Mr. Chritton's] passenger's need for immediate medical attention is not the type of emergency that is contemplated by FAR section 91.3(b)[;] [t]he kind of emergency to which FAR Section 91.3(b) refers is an inflight emergency that requires immediate action ... that arises after takeoff." NTSB Opinion, slip op. at 8. This is a reasonable interpretation of the regulation and is consistent with prior NTSB deci-

sions. *See, e.g., Administrator v. Clark*, 2 N.T.S.B. 2015 (1976); *Administrator v. Morrison*, 1 N.T.S.B. 160 (1968).

Mr. Chritton further contends that the Board's rejection of the emergency defense in this case is tantamount to a finding that the emergency defense can never apply to an air ambulance flight, or that an air ambulance flight can never encounter an emergency situation. This is clearly an overly broad reading of the Board's decision. The Board merely determined that in this case the purpose of the flight could not constitute an emergency within the meaning of FAR section 91.3(b). The Board concluded that "the temporary suspension of the effectivity of the operating rules of FAR Part 91, for the duration of the emergency itself, is not intended to extend to an entire flight operation [notwithstanding the purpose of the flight] but only to an unforeseeable condition that arises after takeoff." NTSB Opinion, slip op. at 8. In rejecting petitioner's assertion of the defense, the Board simply declined to construe FAR section 91.3(b) as excusing a pilot from the requirements of the FAR based solely on the purpose of the flight and as exempting from the regulations all air ambulance flights transporting critically ill patients. Certainly the NTSB's opinion leaves open the possibility that the emergency defense may apply to an air ambulance flight that encounters an unforeseeable weather emergency while in flight.

Finally, Mr. Chritton understandably takes exception to the last sentence of the Board's decision which states that "[i]n any event, [Mr. Chritton] cannot be released from the regulation that requires him to remain clear of obstructions to safe flight even in an inflight emergency." NTSB Opinion, slip op. at 8. He claims that this holding is arbitrary and capricious in that it effectively vitiates the emergency defense by holding it inapplicable to violations of regulations mandating that pilots avoid obstructions to safe flight even when those violations occur in response to flight emergencies. While the Board's concluding sentence is less than crystal clear, we are bound to "uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation Inc. v. Arkansas–Best Freight Systems Inc.*, 419 U.S. 281, 285, 286, 95 S.Ct. 438, 441, 442, 42 L.Ed.2d 447 (1974) (citing *Colorado Interstate Gas Co. v. F.P.C.*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)). Here, the Board's language may reasonably be construed as meaning that even if petitioner had confronted an inflight emergency, the emergency defense still would not apply because FAR section 91.3(b) only allows deviation from the regulations "to the extent required to meet [the] emergency" and petitioner could have responded to the adverse weather conditions in ways other than flying so low as to hit the power lines. In any event, this final statement, albeit somewhat cryptic, is not essential to the Board's decision.

## CONCLUSION

Accordingly, we affirm the NTSB's opinion. In doing so, we note the ALJ's uncontradicted finding that Mr. Chritton "made this effort with the best of intentions ... in an attempt to save a life." ALJ Opinion at 401.